**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Plaintiff-Appellee,**

v.

**HUNT–WESSON FOODS, INC., Defendant-Appellant.**

**No. 73–1763.**

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1974.

Decided Oct. 24, 1974.

Robert W. Ginnane, David A. Sutherlund, Washington, D. C., for defendant-appellant.

James P. Daley, Robert Schmiege, Attys., C. & N. W. Trans. Co., Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, PELL, Circuit Judge, and MATTHES,[1] Senior Circuit Judge.

PELL, Circuit Judge.

Defendant Hunt-Wesson Foods, Inc., appeals from a district court order granting summary judgment to plaintiff Chicago and North Western Railway Company in an action to recover the alleged balance due in freight charges on 263 multiple-car shipments of canned goods from California received under a proportional rate tariff at Hunt-Wesson's Northlake, Illnois distribution center between January 1966 and January 1970.[2] Hunt-Wesson contends on appeal that the court below erroneously construed the tariff to require outbound shipments forwarded beyond the distribution center consist of the exact cases of canned goods actually received into the warehouse in multiple-car shipments under proportional rate, in order to protect the proportional rate accorded to the goods received. Hunt-Wesson further argues that its record-keeping was adequate to demonstrate its compliance with the tariff's forwarding requirement.

Item 1587 of the Trans-Continental Freight Bureau[3] Tariff 2[4] publishes a proportional rate[5] applicable to canned

---

1. Senior Circuit Judge M. C. Matthes of the United States Court of Appeals for the Eighth Circuit is sitting by designation.

2. The action arose under 49 U.S.C. §§ 1–26, and this court has accorded jurisdiction under 28 U.S.C. §§ 1331 and 1337.

3. The Trans-Continental Freight Bureau is the tariff publishing agent for the Chicago and North Western and certain other railroads. Section 5a of the Interstate Commerce Act (49 U.S.C. § 5b) provides for the formation of such organizations.

4. The tariff was published and filed with the Interstate Commerce Commission in 1965 and became effective on October 15th of that year.

5. For the purposes of this case, rail freight rates can generally be classified as either flat rates or as proportional rates. Flat rates, which carriers publish to cover substantially all types of rail traffic, constitute the basic rates applicable to shipments from station A to station B. A flat rate does not depend for its application on any subsequent transportation of the traffic beyond station B; in other words, a flat rate applies to rail traffic which originates at station A and is consigned for final delivery to station B. On the other hand, when particular situations create special needs carriers often publish lower rates covering the same traffic from station A to station B, called proportional

foodstuffs from the West Coast to Northlake, Illinois. That item provides that the shipment must consist of at least eight freight cars, containing a total of at least one million pounds of canned foodstuffs, which are moving on one bill of lading from a single origin to a single destination. The item further provides that the lower proportional rate only applies to "shipments" which receive a further movement beyond within one year to particular destinations to which rates of not less than 17½¢ per hundred pounds apply.

The tariff also enumerates several rules governing the application of this item. Rule 1 provides that the shipper tendering these eight cars to the rail carrier at origin must submit a bill of lading certifying that the "commodities" shipped will be forwarded to another destination within one year. Rule 2 requires the shipper, within 10 days of delivery of the shipment, to register it with the carrier and to notify the carrier in writing that the shipper intends to forward "the tonnage contained in this shipment" to another destination within one year. Rule 3 states that "no substitution of commodities will be permitted except commodities covered by freight bills registered under provisions of Rule 2 of this item." If, however, after the expiration of a one-year period, the shipper has failed to honor his assurance that the tonnage contained in the shipments would be forwarded, Rule 4 provides that the shipper must pay additional charges amounting to the difference between the lower proportional rate and the higher flat rate.[6] Finally, Rule 6 authorizes the Weighing and Inspection Bureaus (employed by the carriers to police the enforcement of tariffs), to supervise the shipper's records and to certify to the parties whether the shipper has met the conditions necessary to protect the proportional rate.

After the proportional rate went into effect in October 1965, the Interstate Commerce Commission initiated an investigation of all aspects of these rates, including the substitution rule. On April 1, 1966, about three months after Hunt-Wesson had begun utilizing the multiple-car shipment rate, the Trans-Continental Freight Bureau advised the Commission that Rule 3 permitted the substitution of "commodities" which moved into the warehouse at the proportional rate. The Commission issued its . decision upholding the tariff on October 28, 1969. Multiple Car Rates on Canned Foodstuffs, Pacific Coast to the East, 335 I.C.C. 612 (1969).

During the period 1966–1970, Hunt-Wesson made a number of multiple-car shipments of canned foodstuffs from California to the Northlake distribution center. Additionally, Hunt-Wesson made single-car shipments from the West Coast to Northlake on which the higher flat rate was imposed. The canned goods received at Northlake under these two different rates were physically intermingled in the same bags at the distribution center, along with similar kinds of goods received from eastern processing plants. When these items were reshipped outbound in smaller quantities to large retail chains or wholesalers, they were selected from the storage bags on a first-in, first-out basis to insure inventory freshness, without reference to the origin or rate paid on the particular cases of canned goods being forwarded.

At Northlake, Hunt-Wesson employed a perpetual inventory type operation for its record system. Under this system,

---

rates which do depend for their application upon a subsequent transportation of the traffic beyond station B to station C. In other words, traffic moving from station A to station B must subsequently move to station C in order to remain eligible for the proportional rate. Publishing such divergent rates does not constitute discrimination if the carriers can justify the lower proportional rate on the inbound shipment into station A on the ground that the same traffic will later move outbound at the flat rate applicable between station B and station C.

6. Item 6150 of the tariff published a flat rate of $1.43 per hundred pounds, whereas Item 1587 published a proportional rate of $1.15 per hundred pounds.

Hunt-Wesson maintained a file folder for each of the two hundred sixty-three multiple-car shipments at issue. Each file contained a copy of the freight bill for the multiple-car inbound shipment and copies of several outbound bills of lading showing that the number of pounds shipped outbound to be applied against that particular inbound multiple-car shipment (*i. e.*, the record system showed that the volume outbound of a kind of foodstuff equalled the volume of that foodstuff received in each particular multiple-car shipment). These outbound records did not, however, identify the cases of canned goods forwarded as to either their origin or the rate paid when they were shipped inbound, and thus, the identity of the cases received from the West Coast in multiple-car shipments was not preserved. Accordingly, because there was no segregation in the warehouse of commodities as to origin and because forwarded commodities were intermixed with similar commodities produced and packed from origins not covered by freight bills registered under Rule 2, the Milwaukee office of the Western Weighing and Inspection Bureau found that Hunt-Wesson had violated Rule 3 of the tariff and issued correction notices for the shipments involved in this action on the basis of the difference between the proportional rate already paid and the higher flat rate. This created a balance due on the shipments of $755,156.82. The Railway subsequently brought suit to collect this balance. The court below granted summary judgment to the Railway, [7] holding that Rule 3 of Item 1587 prohibiting substitution of commodities unambiguously required that the outbound shipments applied against the inbound multi-car freight bill consist only of the specific cases of canned goods actually received into the warehouse in multi-car shipments. The trial court therefore excluded the alternative interpretation that the tariff requirement was intended to be satisfied by the forwarding of cases of the same commodity received under the tariff even if the forwarded commodity did not arrive under a multi-car tariff or by forwarding different commodities which also arrived at the intermediate stop under the Item 1587 multiple-car rates.

■ We cannot agree with the trial court. We note that Rules 2, 4 and 6 of the tariff were phrased in terms of "tonnage," while Rule 3 employs the term "commodities." To support its conclusion that Rule 3 unambiguously refers only to the exact cases shipped under the multi-car rate, the court below was compelled to equate these two terms of art with each other and with "shipment," as found in the above rules. We believe this is neither the only nor even the most plausible interpretation of the rules in light of either the historical use of these terms of art or the actual application of these tariff rules. This ambiguity inherent in the tariff must, of course, be construed against the carrier. *E. g.*, Union Wire Rope Corp. v. Atchison, T. & S. F. Ry., 66 F.2d 965 (8th Cir. 1933).

The multiple-car rate involved here is a transit rate, Multiple Car Rates on Canned Foodstuffs, Pacific Coast to the East, 335 I.C.C. 612, 617 (1969); that is, a rate which applies from origin to ultimate destination with the privilege of an intermediate storage stop. Because such rates are less than the combination full rates from the origin to the storage point and from that point to the destination, the Interstate Commerce Commission has long been concerned with the issue of substitution at the storage point, to prevent abuse

---

7. The district court, however, disagreed with the Western Weighing and Inspection Bureau's finding that thirty-seven of the shipments could not qualify for the proportionate rate on the additional ground that notice was not received by the Bureau within the ten days required by Rule 2. The lower court held that while the Bureau may have received letters of intent beyond the specified time period, the Bureau had actual notice by means of the copy of the freight bill forwarded the Bureau within the ten-day period. The Railway did not file a cross-appeal from this ruling.

of the transit rate. *E. g.,* In Re Substitution of Tonnage at Transit Points, 18 I.C.C. 280 (1910). In *The Transit Case,* the Commission rescinded a previous rule respecting transit rate applicability and articulated the principle that substitution of like goods—commodities —would be permitted, while substitution of equivalent weights—tonnages—would not be allowed. Originally, this rule was limited to tangible goods where identity was not normally preserved. Later, the Commission extended its applicability to certain products whose identity could be preserved but which could only be traced to their point of origin with extreme difficulty. Substitution of Cotton in the Southwest, 241 I.C.C. 153 (1940); *accord,* Los Angeles Chamber of Commerce v. Atchison, T. & S. F. Ry., 182 I.C.C. 141 (1932). It is the latter category which subsumes the canned foodstuffs at issue in this case. Thus, if words must be given the meaning that they might reasonably carry to the shipper to whom they are addressed, United States v. Missouri-Pacific R. R. Co., 250 F.2d 805, 807 (5th Cir. 1958), it is quite understandable that Hunt-Wesson, unlike the trial court, would not construe "tonnage" and "commodity," as used in the rules implementing Item 1587, as coterminous in meaning, but rather would view the terms as possessing historically distinct connotations.

■ The plausibility of the interpretation of the tariff followed by Hunt-Wesson is amply supported by a textual analysis of the tariff rules themselves. If Rule 3, which permits substitution of "commodities covered by freight bills registered" under Rule 2, were meant to be restricted, as the trial court held, to substitution of "the exact cases that were shipped under the multiple car rate," the drafters of the rule would have certainly provided that substitution must be restricted to "commodities contained in shipments covered by the freight bills registered." The absence of such phrasing is indicative that the rule was intended to prohibit only substitution of commodities of a different

kind than those which arrived at Northlake under a multiple-car tariff—an interpretation which is consistent with *The Transit Case* rule. *Supra* at 289. Moreover, no other implementing rule for Item 1587 indicates any interest by the drafters in the forwarding of the exact cases of commodities received. Rather, under Rule 2, the consignee must state its intention "to forward the tonnage contained in this shipment," while under Rule 4, the consignee shall be penalized if it fails "to forward all the tonnage contained in the shipments," and finally, under Rule 6, the Weighing and Inspection Bureau shall supervise "the disposition of the tonnage covered by the shipment." Finally, the interchangeable use of "covered" and "contained" with reference to shipment, further substantiates the argument that the recurrent use of "tonnage" reflects a purpose to permit compliance with the forwarding requirement with the same kind of goods that was received under the multiple-car rate at the intermediate storage point.

The most powerfully persuasive argument that the tariff's inherent ambiguity permitted the interpretation followed by Hunt-Wesson is that all parties concerned initially agreed that the tariff permitted substitution of commodities received under the single-car rate for identical commodities received under the multiple-car rate and, following subsequent disagreement, the Trans-Continental Freight Bureau filed a clarification of the tariff which authorized the practice initially agreed on in order "to eliminate conflicting interpretations by the Weighing and Inspection Bureaus and to reflect the interpretation of the member lines upon the original intent [of the tariff]."

It is uncontested that Hunt-Wesson shipped canned foodstuffs under the multiple-car rate for approximately three and one-half years before its substitution in forwarding of goods received under the single-car rate was challenged by the Milwaukee office of the Western Weighing and Inspection Bureau. Furthermore, it is without contest that the

Milwaukee office expressly certified the first thirty-six shipments subsequently subject to the correction notice.

This original and continuing consensus of the shipper, the carrier, and the Weighing Bureau as to the proper application of Rule 3 strongly suggests that the interpretation followed by Hunt-Wesson was well founded on the ambiguity of the rule.

As the Commission found in Appalachian Power Co. v. Norfolk & W. Ry. Co., 152 I.C.C. 389, 392 (1929):

> "While the facts that the carrier and the public generally have agreed on the construction of a tariff for a long period of time and shippers and receivers of freight have accepted that interpretation and paid freight charges in accordance therewith without protest is not conclusive that the interpretation is correct, such facts are entitled to considerable weight and are persuasive that such an interpretation is the fair and reasonable one to be gathered from the tariffs themselves."

*Accord,* Albertson & Co. v. Akron, C. & Ry. Co., 174 I.C.C. 725, 733 (1931).[8]

Moreover, when the conflict in the interpretation of Item 1587 respecting Hunt-Wesson became apparent, the Trans-Continental Freight Bureau, which had originally published the tariff, issued a clarification designed to dispel the real controversy over the correct interpretation among the weighing bureaus[9] and to restate its member lines' original intent in promulgating the rules implementing Item 1587. The substance of the clarification was as follows:

> "In publishing this tariff, it was the intent of the TCFB and its participating carriers to permit a shipper to meet the forwarding requirements of the rate in three ways:
>
> (a) by forwarding the exact cases received under Item 1587;
>
> (b) by forwarding cases of the same commodities as those received under Item 1587 even though the cases forwarded do not arrive under Item 1587; or
>
> (c) by forwarding different commodities so long as the different commodities also arrive under Item 1587."

The conflict among weighing bureaus compelling the issuing of the above clarification clearly demonstrates the ambiguity of the rule in question, which this court resolves in favor of the shipper, Hunt-Wesson.

Under our interpretation of the tariff, since Hunt-Wesson forwarded within a year at least one million pounds of the identical commodity at a rate of at least 17½ cents per 100 pounds, judgment should have been entered for the defen-

---

8. This is a general principle of construction, as indicated by Section 235 (e) of the Restatement of Contracts which provides that "If the conduct of the parties subsequent to a manifestation of intention indicates that all the parties placed a particular interpretation upon it, that meaning is adopted if a reasonable person could attach it to the manifestation."

9. John W. Owens, General Traffic Manager for Hunt-Wesson, stated, in elaborating the statement of the Chairman of the Trans-Continental Freight Bureau concerning the existence of a controversy among the Weighing Bureaus respecting interpretation of the rule: "In this regard it should be noted that the Southern Weighing and Inspection Bureau, the Eastern Weighing and Inspection Bureau and the St. Louis and New Orleans offices of the Western Weighing and Inspection Bureau have all continuously approved and certified Hunt-Wesson's records on the basis of the same record keeping system questioned in this case by the Milwaukee office of the Western Weighing and Inspection Bureau. It should also be noted that even the Milwaukee office of the Western Weighing and Inspection Bureau initially approved the Hunt-Wesson record keeping system and initially certified at least 36 multiple car shipment as qualifying with the requirements of the tariff. It was not until some time after June, 1969, that the Milwaukee office of the Western Weighing and Inspection Bureau questioned Hunt-Wesson's record keeping system."

dant. Accordingly, judgment for the plaintiff is vacated and the cause is remanded for the entry of judgment for the defendant.

Vacated and remanded.