**UNION PACIFIC RAILROAD COMPANY, a corporation, Plaintiff-Appellee,**

v.

**BAY AREA SHIPPERS CONSOLIDATING ASSOCIATION, INC., Defendant-Appellant.**

No. 76–1428.

United States Court of Appeals, Ninth Circuit.

April 10, 1979.

Marvin Handler, Raymond Greene, Handler, Baker & Greene, San Francisco, Cal., for defendant-appellant.

Jeff S. Asay, Los Angeles, Cal., for plaintiff-appellee.

Robert Burke, Asst. Gen. Counsel, Washington, D. C., for amicus curiae.

Before BROWNING and HUFSTEDLER, Circuit Judges, and BONSAL *, District Judge.

PER CURIAM:

Union Pacific Railroad Company was awarded summary judgment on its claim for freight charges allegedly due on two shipments of goods by the Bay Area Shippers Consolidating Association (BASCA). We hold that the district court was correct in finding BASCA liable for the charges for failing to comply with the governing tariff,

* Honorable Dudley B. Bonsal, District Judge for the Southern District of New York, sitting by designation.

but that the reasonableness of the charges imposed by that tariff should be referred to the Interstate Commerce Commission for exercise of its primary jurisdiction.

I.

The facts are stipulated. In December 1971, BASCA sent two "battery shipments" of goods from Chicago to the West Coast. A "battery shipment" is a grouping of two or more railcars under a single bill of lading. It is governed by Trans-Continental Freight Bureau Tariff No. 1–T, Supplement 72. The Tariff provides for transportation from an initial origin to a final destination. However, one or more of the cars making up a "battery shipment" may originate or terminate at intermediate points, paying the full multiple-car rate for the entire route plus a per stop charge. The freight rates for battery shipments are sufficiently below the rates for single carloads that even shippers who originate or terminate at intermediate points find battery shipment desirable. See generally Stopping-in-Transit Charges & Restrictions, U.S.A., 337 I.C.C. 605, 607–08 (1970).

The bill of lading for each of the two battery shipments involved here listed the destination as Los Angeles and the carrier routing as "BN–UP–SP–SP–UP," the initials representing Burlington Northern Railroad, Union Pacific Railroad, and Southern Pacific Railroad. In accordance with this routing, each shipment was relayed from the Burlington Northern Railroad to the Union Pacific. At Ogden, Utah, each shipment was split: Southern Pacific delivered about half of each group of cars to San Francisco; Union Pacific continued with the remaining cars directly to Los Angeles.[1]

The dispute concerns the proper interpretation of the following tariff provision:

1. Cars consigned to Los Angeles consignees were physically delivered by Los Angeles Junction Railway Co., a switching carrier acting as Union Pacific's agent whose participation is legally insignificant.

For each bill of lading, the shipper must furnish a manifest [2] as specified above *to be delivered to the* origin carrier, if prepaid, or *destination carrier, if collect,* as the case may be, within five business days after the shipment reaches destination or within 30 days after the date of the bill of lading. (Emphasis added.) Trans-Continental Freight Bureau Tariff No. 1–T, Supplement 72, Item 245–B, Note 1(c)(2).

Both shipments in this case were collect. Manifests were therefore to be filed within the time stated with the destination carrier, whose responsibility it was to allocate the freight revenues for the shipment among the participating intermediate carriers. Failure to file the manifests as provided subjected the shipper to significantly increased freight charges.[3] BASCA furnished the manifests to Southern Pacific within the specified time limits. Southern forwarded the manifests to Union Pacific, which received them approximately six weeks after the filing period had expired.

Union Pacific assessed BASCA the additional freight charges specified by the tariff on the ground that Union Pacific was the "destination carrier" and BASCA had failed to file the manifests with it in the time required. BASCA refused to pay and Union Pacific sued. BASCA defended on the ground that the term "destination carrier" could be understood to mean either Union Pacific or Southern Pacific because each had delivered cars to final destinations in Los Angeles and San Francisco, respectively; that this rendered the tariff ambiguous; and that since tariff ambiguities are to be read against the carrier, *Penn Central Co. v. General Mills, Inc.,* 439 F.2d 1338, 1341 (8th Cir. 1971), the timely filing of the manifests with Southern sufficed.

The district court disagreed, noting that the tariff

refers to ". . . the . . . destination carrier," indicating that only one exists. As between UP and SP, UP is the only reasonable choice. First, a battery shipment, for billing purposes, is treated as a fictional unit. Here, each shipment—as such a unit—traveled from Chicago to Los Angeles. Los Angeles was listed on each bill of lading as "Destination;" UP was listed as the last carrier on the "Route" . . . .. The only reasonable interpretation of "destination carrier" is "the carrier moving the rail cars to the destination city printed on the bill of lading."

Summary judgment and this appeal following.

■ We agree with the district court that, for the reasons stated by the court, there is not a sufficient basis for doubt as to the meaning of the tariff to permit an interpretation favorable to the shipper. "[C]laimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in light of the ordinary meaning of the words used and not a mere arguable basis." *United States v. Missouri-Kansas-Texas R. R.,* 194 F.2d 777, 779 (5th Cir. 1952).

Both bills of lading clearly designate Los Angeles as the "destination" of the shipments. Both designate Union Pacific as the last carrier on the route. The "battery shipment" rate is premised on the fiction that a single unit of cars is moving between the origin and destination cities; while parts of the unit are permitted to splinter off to intermediate cities, the entire shipment is treated as having moved fictionally through all of the intermediate cities to the final destination. *See Stopping-in-Transit Charges & Restrictions, U. S. A., supra,* 337 I.C.C. at 607–08. Thus, even though the shipment in fact divides midway on its journey, as in this case, the only plausible choice

---

2. A manifest is an itemized listing of cargo type, weight, and rate class.

3. The Tariff provides [Item 245–B, Note 1(e)]:

. . . . if any of the items and conditions of the manifest requirements of this Note or the other provisions of this item are not complied with, freight charges shall be assessed on the basis of Class 70 [single carload rates] at actual weight of shipment, but not less than 30,000 pounds multiplied by the number of cars used to transport the shipment.

for "destination carrier" under the logic of the tariff is the carrier moving the shipment to the destination city identified on the bill of lading. The Commission informs us that this is in accord with common industry usage, and appellant does not disagree.

BASCA contends that ambiguity is established by the fact that Union Pacific accepted payment at the battery shipment rate for three similar shipments in the three preceding months though the manifests for those shipments were tendered to Southern Pacific. BASCA relies upon *Calcium Carbonate Co. v. United States,* 256 F.Supp. 99, 102–03 (S.D.Ill.1966), in which the court inferred carrier agreement with the shipper's interpretation of a tariff based upon the carrier's acceptance of numerous shipments over a three-month span. So few instances of improper filing of manifests over so short a period of time might well occur without coming to the carrier's attention; failure to react to the erroneous filings in such circumstances hardly reflects "indifference, negligence, or plain stupidity" on the carrier's part. *Cf. id.* at 103.

BASCA also asserts that Union Pacific conceded ambiguity by a post-litigation proposal that the battery shipment tariff be amended by adding a definition of "destination carrier" as the carrier delivering cars to the destination listed on the bill of lading. We read the proposed amendment as making perfectly clear what was already clear enough, perhaps to foreclose future meritless but nonetheless expensive litigation.[4]

## II.

There is more substance in BASCA's further argument that the magnitude of the additional charges assessed as a result of the misdelivery of the manifests—more than triple the charge at battery shipment rates—is excessive and constitutes an unen-

forceable penalty. As the Commission points out in an amicus brief, BASCA's infraction appears technical at best. Neither counsel was able at oral argument to suggest a rational relationship between the costs that misdelivery of a manifest may impose on the carrier and the apparently severe consequences that it visits on the shipper.

The claim is, however, one within the Commission's primary jurisdiction. "Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission." *Great Northern R. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). *See also United States v. Western Pacific R. R.,* 352 U.S. 59, 63, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

The proceeding is therefore remanded to the district court so that appellant may, if it wishes, move the district court to refer the proceeding to the Interstate Commerce Commission for the exercise of the Commission's primary jurisdiction.

Remanded.

---

4. *Chicago & North Western Ry. Co. v. Hunt-Wesson Foods, Inc.,* 504 F.2d 905 (7th Cir. 1974), is not to the contrary. There a post-dispute tariff clarification reflected preexisting ambiguity. The tariff language itself gave initial support to the shipper's interpretation in *Hunt-Wesson. See id.* at 909. There is no similar textual support for BASCA's interpretation here. The clarification was preceded by an extended controversy among shippers, carriers, and weighing bureaus over the meaning of the tariff. *Id.* at 909–10. No similar history of controversy regarding the meaning of "destination carrier" has been suggested here.