**DELTA TRAFFIC SERVICE, INC. et al, Plaintiffs, Appellees,**

v.

**TRANSTOP, INCORPORATED,**
**Defendant, Appellant.**

No. 89–1662.

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1989.

Decided April 13, 1990.

Order Modifying Opinion
July 19, 1990.

Robert J. Gallagher, Northampton, Mass., for defendant, appellant.

William J. Augello, Augello, Pezold & Hirschmann, P.C., Huntington, N.Y., Leonard M. Singer, Csaplar & Bok, Boston, Mass., Netti C. Vogel, Kiernan & Plunkett, Providence, R.I., James W. Muldoon, Muldoon, Pemberton & Ferris, Raymond Randall and Lyon, Scully, Fitzpatrick, Rohan, Randall & Connor, Holyoke, Mass., on brief, for Ampad, Inc., Curriculum Associates, Inc., Ferguson Perforated Wire and Co., and Taco, Inc., amici curiae.

Joseph L. Steinfeld, Jr., with whom Robert B. Walker, John T. Siegler, Sims, Walker & Steinfeld, P.C., Washington, D.C., Wesley S. Chused, Frank J. Weiner, and Kroll & Tract, Boston, Mass., were on brief, for plaintiffs, appellees.

Robert S. Burk, Ellen D. Hanson and Cecelia E. Higgins, Washington, D.C., on brief, for Interstate Commerce Com'n, amicus curiae.

Before BOWNES, BREYER, and SELYA, Circuit Judges.

BREYER, Chief Judge.

■ Assume that a federally regulated motor carrier files, with the Interstate Commerce Commission, a tariff that contains a rate of, say, $10 per ton. Assume further that the carrier tells a shipper that its rate is only $8 per ton, and it falsely adds that it has recently filed a new tariff containing the $8 rate. The carrier charges $8, the shipper pays it, and later, perhaps years later, the carrier sues the shipper for an additional $2; the shipper responds (1) that the $10 rate is unreasonably high and (2) regardless, the carrier's attempt to collect it, under the circumstances, is unfair. *See* 49 U.S.C. § 10701(a) (stating that a carrier's "rate[s]" and "practice[s]" must be "reasonable"). Who should decide, in such circumstances, whether the rate, and the carrier's collection practice, are "reasonable"? The issue in this case is whether the Interstate Commerce Commission should decide those questions or whether the court in which the carrier brought suit should decide them.

In our view, Congress intended the Commission to answer questions of this sort.

Where, as here, the Commission's answers will likely determine the outcome of the legal action, and particularly where, as here, the Commission itself has asked this (appellate) court to refer these issues to it for determination, we believe the doctrine of "primary jurisdiction" requires such referral. *See generally United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 62–70, 77 S.Ct. 161, 164–68, 1 L.Ed.2d 126 (1956) (describing the doctrine of "primary jurisdiction"). We set aside the district court's judgment to the contrary.

## I

### *Background*

The relevant facts are undisputed: Between February 1984 and September 1985 a shipper, Transtop, hired a federally regulated motor carrier, Oneida, to carry goods. The shipper and carrier agreed on certain rates; the shipper paid those rates; the carrier's employees told the shipper that the carrier had filed tariffs with the ICC embodying those rates. In fact, however, the carrier had not filed those tariffs; instead, it had filed tariffs with higher rates. The carrier declared bankruptcy; it appointed Delta (a freight-bill-auditing company) to collect any debts it could find; Delta discovered that the shipper had paid less than the tariff rate for various shipments; consequently, Delta sued the shipper for the difference (about $54,000).

Delta's argument to the district court was simple: The undisputed facts entitled it to judgment. The Interstate Commerce Act ("ICA" or the "Act"), 49 U.S.C. §§ 10101–11917, like many regulatory statutes, says that a regulated firm must "publish and file with the Commission tariffs containing [its] ... rates," *id.* § 10762(a)(1). The Act also provides that a

> carrier may not charge or receive a different compensation for ... transportation ... than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation ... or another device.

*Id.* § 10761(a). The Supreme Court, over the years, has held that these words mean what they say. "Deviation from [the filed rate] is not permitted upon any pretext.... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed." *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *accord Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) (No "act or omission of the carrier (except the running of the statute of limitations) [can] estop or preclude it from enforcing payment of the full amount by a person liable therefor."); *Western Transp. Co. v. Wilson & Co.*, 682 F.2d 1227, 1231 (7th Cir.1982) ("Congress did not create a flexible standard for the courts to apply in accordance with the facts, equities, and economic realities of the particular case. It forbade carriers to receive any different compensation from the rate in the applicable tariff.") If Delta does not win this suit, the carrier (Oneida) will have received a "compensation for ... transportation" that is lower than, and therefore "different" from, the compensation "specified in" its filed "tariff." And that, says Delta, is why the law requires that it prevail.

The shipper, Transtop, responded by pointing to a different section of the Act, a section that says,

A rate, ... classification, rule, or practice related to transportation ... provided by a carrier ... must be reasonable....

42 U.S.C. § 10701(a). It argued that the rate contained in the carrier's filed tariff was not a "reasonable" "rate," and that the carrier's attempt to collect it, given the (unfair) circumstances, was not a "reasonable" "practice." It pointed to Supreme Court cases which say that "[w]henever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission." *Great Northern Ry. v. Merchants Elev. Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *see Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 1986–87, 48 L.Ed.2d 643 (1976). And it asked the court to refer this matter to the ICC.

The district court decided not to send the case to the ICC for two reasons. First, based on evidence in the record, it doubted that the reasonableness of the filed tariff rate itself was really an issue. Second, it believed that the law, in particular the "filed tariff" language we have quoted above, prevented the Commission from deeming the carrier's efforts to collect the extra money amount an "[un]reasonable" "practice," 49 U.S.C. § 10701(a). Assuming this were so, referral to the Commission would serve no purpose, for, irrespective of the Commission's decision, the court would have to award Delta the money it sought.

We have reviewed the record and the briefs, in particular the ICC's *amicus* brief, and we reach a different conclusion about the usefulness of referral. We believe that the doctrine of "primary jurisdiction" requires the district court to refer this matter to the ICC for a determination of the "reasonableness" questions.

## II

### *The Legal Merits*

■ The doctrine of "primary jurisdiction" requires a court to "suspend[ ]" its "process" and refer a matter to an "administrative body" whenever "enforcement of" a judicial claim "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of [that] administrative body." *Western Pacific*, 352 U.S. at 63–64, 77 S.Ct. at 164–65. *Western Pacific* itself involved a typical application of the doctrine. A carrier filed a tariff containing its rates for various types of cargo; the shipper believed that a low rate applied to a particular shipment; the carrier thought a higher rate applied and sued for the difference. The shipper argued that (1) the tariff, properly construed, imposed the lower, not the higher, rate, and (2) *if not*, the tariff's high rate was not "reasonable" as applied to the shipment in question. The Supreme Court held that the district court *could not find*

either for the carrier or shipper until the ICC determined *both* questions. In the Court's view, the ICC, an expert and experienced body, was better equipped to answer such questions; Congress wanted the ICC to answer questions of this sort; and to permit *courts* to answer these questions independently would threaten the nationwide uniformity of rate that the Interstate Commerce Act sought. *See Western Pac.*, 352 U.S. at 62–70, 77 S.Ct. at 164–68; *Great Northern Ry. Co.*, 259 U.S. at 291–92, 42 S.Ct. at 479 (1922) (Brandeis, J.); *Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 435–48, 27 S.Ct. 350, 353–58, 51 L.Ed. 553 (1907). After the ICC acted, the district court could review the result, applying ordinary principles of administrative law. *See* 28 U.S.C. § 1336(b) (referring court has exclusive jurisdiction to review ICC order arising from referral); *ICC v. Atlantic Coast Line R.R. Co.* 383 U.S. 576, 580, 86 S.Ct. 1000, 1004, 16 L.Ed.2d 109 (1966) (dicta). But assuming the ICC's determinations survived that review, the court would have to abide by those determinations when it returned to, and decided, the remaining issues before it. *See id.* at 594, 86 S.Ct. at 1011 ("Commission findings on questions required under the primary jurisdiction doctrine to be determined first by the Commission are conclusive in the same sense that such findings would be conclusive in suits to set aside the Commission's order."); *Locust Cartage Co. v. Transamerican Freight Lines, Inc.*, 430 F.2d 334, 341 (1st Cir.) ("When the Commission resolves a question within its primary jurisdiction, its resolution should not be set aside unless it exceeds the Commission's statutory authority or is unsupported by substantial evidence"), *cert. denied*, 400 U.S. 964, 91 S.Ct. 365, 27 L.Ed.2d 383 (1970). Thus, in *Western Pacific*, an ICC determination either that the tariff imposed the low rate, *or* that the high rate was unreasonably high, would have barred judgment for the carrier.

Applying the *Western Pacific* principle to the case before us, we shall explain why we think it requires referral of both the "rate reasonableness" and the "practice reasonableness" questions to the ICC.

## A

### Reasonable Rates

As *Western Pacific* itself makes clear, where the "reasonableness" of the filed rate is at issue in a carrier's rate-collection suit, the court should refer the matter to the ICC and apply the ICC's result. Although the Supreme Court has also said, in strong terms, that a shipper *must* pay the filed rate, its cases are not in conflict on this point. In *Maxwell*, where the Supreme Court announced the "filed rate doctrine" in absolute-sounding language ("Deviation [from the filed rate] is not permitted upon any pretext"), it followed that language with the sentence:

> Shippers and travelers are charged with notice of [the filed rate], and they as well as the carrier must abide by it, *unless it is found by the Commission to be unreasonable.*

*Maxwell*, 237 U.S. at 97, 35 S.Ct. at 495 (emphasis added). Seventeen years later, the Court explained that a carrier must charge the filed rate (which the Court called the "legal" rate) to "all shippers alike," but that the "legal" rate was not necessarily "lawful." *Arizona Grocery Co. v. Atchison, T. & S.F. Ry. Co.*, 284 U.S. 370, 384, 52 S.Ct. 183, 184, 76 L.Ed. 348 (1932). A rate is "lawful," said the Court, only if it is "reasonable." *Id.* And a shipper may recover the difference between a high, filed ("legal") rate and a lower, reasonable ("lawful") rate by bringing a suit against the carrier for reparations. *Id.; accord Pennsylvania R.R. Co. v. International Coal Mining Co.*, 230 U.S. 184, 197, 33 S.Ct. 893, 896, 57 L.Ed. 1446 (1913); *cf.* 49 U.S.C. § 11705(b)(3) (creating cause of action for reparations) (original version at 49 U.S.C. § 304a(2) (repealed 1978)).

■ Because shippers may assert the unreasonableness of a rate as grounds for recovery in a reparations suit, courts ordinarily have permitted shippers to assert this same ground as a *defense* in a *carrier's suit* to collect the filed ("legal") rate. *See, e.g., Western Pacific, supra; United*

*States v. Chesapeake & Ohio Ry. Co.*, 352 U.S. 77, 80, 77 S.Ct. 172, 173 1 L.Ed.2d 140 (1956); *Pennsylvania R.R. Co. v. United States*, 363 U.S. 202, 203, 80 S.Ct. 1131, 1132, 4 L.Ed.2d 1165 (1960) (dicta); *Union Pac. R.R. Co. v. Bay Area Shippers Consolidating Ass'n, Inc.*, 594 F.2d 1291, 1294 (9th Cir.1979) (per curiam); *Chicago, Rock Island & Pac. R.R. Co. v. Furniture Forwarders, Inc.*, 420 F.2d 385, 386–89 (8th Cir.1970); *Indiana Harbor Belt R.R. Co. v. Industrial Scrap Corp.*, 672 F.Supp. 1041, 1042 (N.D.Ill.1986); *Port of Bandon v. Oliver J. Olson & Co.*, 175 F.Supp. 736, 741–42 (D.Or.1959) (referring case to United States Maritime Board). In such cases, the shipper may "ask for a stay of the court proceedings and then ask the Commission to declare the [higher rate] ... unreasonable." *Western Transp.*, 682 F.2d at 1231; *cf. Carnation Co. v. Pacific Westbound Conf.*, 383 U.S. 213, 223, 86 S.Ct. 781, 787, 15 L.Ed.2d 709 (1966) (Shipping Act); *General American Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 433, 60 S.Ct. 325, 331, 84 L.Ed. 361 (1940) ("When it appeared in the course of the litigation that an administrative problem, committed to the Commission, was involved, the court should have stayed its hand pending the Commission's determination of the lawfulness and reasonableness of the practices under the terms of the Act."). This legal regime tends (1) to prevent carriers from favoring particular shippers by charging a lower-than-filed-tariff rate, (2) to protect shippers from having to pay a higher-than-reasonable rate, and (3) to permit the relevant expert body, the ICC, to make the relevant expert determinations.

We should have thought that courts universally accepted this basic legal framework had we not found a recent Fifth Circuit case to the contrary, *Supreme Beef Processors, Inc. v. Yaquinto*, 864 F.2d 388 (5th Cir.1989). The carrier in *Supreme Beef* filed a tariff with a high rate; the shipper paid a lower rate; and the carrier sued the shipper for the difference. The shipper said the high rate was unreasonably high and asked the district court to refer the "reasonableness" question to the ICC. The district court refused, and the

Fifth Circuit *affirmed* its decision, stating that a

> shipper that pleads unreasonableness as a defense cannot prevent enforcement of the filed tariff doctrine or force the district court to stay proceedings and refer the case to the Commission.

*Id.* at 392. In support of this statement (which seems to conflict with the authority and reasoning we set forth in the preceding paragraph), the Fifth Circuit cited a similar statement in an earlier Fifth Circuit opinion, *Southern Pac. Transp. Co. v. San Antonio*, 748 F.2d 266, 274 (5th Cir.1984), which, in turn, relied upon the authority of a line of Supreme Court cases culminating in *Burlington Northern Inc. v. United States*, 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982). *See Consolidated Rail Corp. v. National Ass'n of Recycling Indus., Inc.*, 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981) (per curiam); *Atchison, T. & S.F. R. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973); *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Arrow Transp. Co. v. Southern Ry. Co.*, 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963).

We do not think these Supreme Court cases support the "no referral" rule adopted by the Fifth Circuit in *Supreme Beef.* The Supreme Court cases cited involved efforts by federal courts to enjoin the *future* application of rates the carrier had filed with the Interstate Commerce Commission. In *Burlington Northern*, for example, a federal circuit court of appeals held that a carrier could not collect new rates that had been filed with the ICC, rates that the ICC had under scrutiny. The Supreme Court reversed this decision on the grounds that it would *frustrate* the Interstate Commerce Act's regulatory regime in several ways. For example, it would *"undermine[ ]"* the agency's "primary jurisdiction." *See Burlington*, 459 U.S. at 142, 103 S.Ct. at 521; *Wichita Bd. of Trade*, 412 U.S. at 820–26, 93 S.Ct. at 2381–84. It would threaten *non*uniformity in ratemaking. *See Burlington*, 459 U.S. at 139, 103 S.Ct. at 520; *Arrow Transp.,*

372 U.S. at 663, 668, 83 S.Ct. at 989; *SCRAP*, 412 U.S. at 696–98, 93 S.Ct. at 2420–21. And it would prove "inequitable," for a shipper forced to pay a high filed rate has a perfectly good "reparations" action if the ICC *later* decides that the filed rate was unreasonably high, but a carrier forced to collect a lower-than-filed-rate can never recover the high filed rate, even if it should later prove reasonable. *See Burlington*, 459 U.S. at 141–42, 103 S.Ct. at 521–22; *Wichita Bd. of Trade*, 412 U.S. at 823–24, 93 S.Ct. at 2383; *SCRAP*, 412 U.S. at 697, 93 S.Ct. at 2421; *Arrow Transp.*, 372 U.S. at 664–66, 83 S.Ct. at 987–88.

None of this reasoning applies in the classical *Western Pacific* set of circumstances, circumstances of the sort now before us. To stay the instant collection action, pending ICC determination of the tariffs' reasonableness, will not preclude eventual collection of any filed rate; it is not inequitable; it will permit decisionmaking by the expert body; it will advance, rather than retard, primary jurisdiction policies. It therefore does not surprise us that the Supreme Court nowhere suggested, in the cases we have just discussed, any intent to overrule, or to depart from, *Western Pacific* or the policies that underlie it and related cases. For these reasons, we shall not follow the Fifth Circuit's decision in *Supreme Beef.*

We have also noticed a potential confusion that arises out of another Supreme Court case, *T.I.M.E. Inc. v. United States*, 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959), which held that a shipper could not raise a "rate unreasonableness" defense in a carrier's rate-collection action. *T.I.M.E.* was decided, however, before the Motor Carrier Act provided shippers a legal right to "reparations," *i.e.*, a right to recover past charges that were unreasonably high. *See id.* at 468–80, 79 S.Ct. at 907–13. The *T.I.M.E.* Court interpreted the (*then*-existing, but not *now*-existing) absence of a reparations remedy as a clear Congressional decision to prevent shippers from either recovering *or resisting* past motor carrier charges on grounds of unreasonableness. *See id.* at 475, 79 S.Ct. at 910. In 1965,

Congress enacted a new statutory provision making motor carriers liable to shippers "for damages resulting from the imposition of rates ... the Commission finds to be in violation of this subtitle," Pub.L. 89–170, § 6, 79 Stat. 651 (amending 49 U.S.C. §§ 304a(2, 5)) (repealed and recodified at 49 U.S.C. §§ 11705(b)(3), 11706(c)(2)), a subtitle that includes a requirement that rates "must be reasonable," *id.* § 10701(a). This statutory amendment cures the statutory deficiency identified in *T.I.M.E.* Armed with this new right, motor shippers, like rail shippers, can litigate the reasonableness of past charges in a suit for reparations. *See, e.g., United States v. Associated Transport*, 505 F.2d 366, 368 (D.C.Cir.1974) (per curiam). It follows that motor shippers, like rail shippers, should be able to assert the unreasonableness of past charges as a *defense* in a carrier's suit for undercharges. *Cf. Western Pac. R.R., supra; T.I.M.E., supra.*

One important question remains. Does the record in this case raise a possibility that the ICC might find the filed rate unreasonably high? We think the answer is Yes. For one thing, the record contains evidence that the rates charged by Oneida, and paid by Transtop, are substantially lower than the rates contained in Oneida's filed tariffs. For another thing, the ICC has requested us to refer this case for a "reasonableness" determination. In our view, these facts, taken together, show a sufficient possibility of an "unreasonableness" determination to warrant referral. After all, a filed rate is unreasonably high if it significantly exceeds the costs of service, and the fact that the negotiated rates in this case are significantly lower than the filed rates suggests that the filed rates may have significantly exceeded costs.

Of course, other things (besides the unreasonableness of the filed rates) might explain the discrepancy between the filed and the negotiated rates. For example, the filed rate might represent the average cost of a broad class of transportation services, and the negotiated rate might reflect the "true" cost of a subclass of that service which is especially cheap to provide. Or

the carrier in this case, when it negotiated the lower rate, might simply have made a mistake; after all, it did declare bankruptcy. Nevertheless, given the ICC's interest in determining the matter, and the presence of the negotiated lower rate, one cannot say that the record precludes an agency finding of "unreasonableness." We are aware of no other factor that militates against a stay. That being so, "primary jurisdiction," and the policies that underlie it, require a stay and referral to the ICC of the "rate reasonableness" question.

### B *

*Reasonable Practices*

The ICC wishes to determine the "reasonableness" of Delta's rate collection "practice," *i.e.*, the "practice" of bringing this lawsuit to collect undercharges for which the carrier is responsible. The ICC points to 49 U.S.C. § 10701(a), which says that every carrier "practice related to transportation . . . must be reasonable." It adds that, in two important agency proceedings, it has specifically declared "unreasonable" a "course of conduct" consisting of:

(1) negotiating a rate;

(2) agreeing to a rate that the shipper reasonably relies upon as being lawfully filed;

(3) failing, either willfully or otherwise, to publish the rate;

(4) billing and accepting payment at the negotiated rate for (sometimes) numerous shipments; and

(5) then demanding additional payment at higher rates.

*Ex Parte No. MC–177*, 5 I.C.C.2d 623, 628 n. 11 (June 14, 1989) (*Negotiated Rates II*); accord *Ex Parte No. MC–177*, 3 I.C.C.2d 99 (1986) (*Negotiated Rates I*). More than 100 federal decisions, including three by circuit courts of appeals, have held that the ICC has "primary jurisdiction" to determine whether a carrier's court suit amounts to an "unreasonable" practice in these, or related, circumstances. *See Delta Traffic Serv., Inc. v. Appco Paper & Plastics Corp.*, 893 F.2d 472 (2d Cir.1990); *West Coast Truck Lines, Inc. v. Weyerhaeuser*

*Co.*, 893 F.2d 1016 (9th Cir.1990); *Maislin Indus. v. Primary Steel, Inc.*, 879 F.2d 400 (8th Cir.1989); *see also Seaboard System R.R. v. United States*, 794 F.2d 635, 637 (11th Cir.1986) (where rail carrier published ambiguous tariff and then misquoted applicable rate under that tariff, ICC could find carrier's attempt to collect applicable tariff rate to be an unreasonable practice). The ICC asks us to follow those courts and to apply that doctrine here.

On the other hand, as Delta suggests, there is little point in referring the matter to the ICC unless the ICC has the legal power to find that Delta's undercharge collection "practice" is not "reasonable." *See* 49 U.S.C. § 10701(a). Delta argues vehemently that the three circuit courts we have mentioned, and the many district courts, are wrong to hold, or to imply, that the ICC could lawfully make such a finding. It points to the statute's "filed tariff" language, which says that a carrier "may not charge or receive a different compensation . . . than the rate specified in the tariff." *Id.* § 10761(a). Congress wrote those words to prevent a carrier from charging one shipper a lower rate than another. *See New York, N.H. & H. R.R. Co. v. ICC*, 200 U.S. 361, 391–92, 26 S.Ct. 272, 276–77, 50 L.Ed. 515 (1906); S.Rep. No. 46, 49th Cong., 1st Sess. 181, 188–90, 198–200 (1886) [hereinafter *S.Rep. No. 46*]. The courts, for many years, have interpreted the language strictly. *See, e.g., Southern Pac. Transp. Co. v. Commercial Metals Co.*, 456 U.S. 336, 343, 102 S.Ct. 1815, 1820, 72 L.Ed.2d 114 (1982) ("[A] carrier has not only the right but also the duty to recover its proper charges for services performed."); *Central Iron Co.* 265 U.S. at 66, 44 S.Ct. at 442 (" '[It] is the duty of carriers to exhaust their legal remedies in order to collect undercharges from the party or parties legally responsible therefor.' " (quoting ICC Conf. Ruling No. 314, Bull. No. 7 (Aug. 1, 1917))); pp. 4–5, *supra* (citing cases). To prevent a carrier from collecting amounts it has undercharged a shipper (particularly where the filed tariff rate itself is *reasonable*), Delta argues, would permit the carrier to do just what the stat-

---

* Section B withdrawn, see p. 112 infra.

ute forbids. Therefore, Delta urges, we should follow the minority of courts, including one circuit court of appeals, *see Supreme Beef, supra,* and the district court below, that have refused to refer cases such as this one to the ICC.

■ We have decided to follow the majority, rather than the minority, of courts. We shall refer this case to the ICC because, in our view, the ICC has the statutory power to declare this lawsuit an "[un]reasonable" "practice," 49 U.S.C. § 10701(a), even if the filed tariff rate itself is reasonable. We hold this, despite the strong statutory "filed tariff" language and the language of the cases interpreting it, for several reasons.

At the outset, we note that the language in the relevant filed-tariff provision, 49 U.S.C. § 10761(a), does not *literally* forbid the ICC to find that the bringing of a suit such as this one is an "[un]reasonable" "practice," *id.* § 10701(a). Moreover, the courts have sometimes spoken of the "filed rate doctrine" in less absolute terms than our previous quotations from the cases, *see* p. 19, *supra,* might suggest. *See, e.g., Commercial Metals,* 456 U.S. at 352, 102 S.Ct. at 1825 (permitting carrier that violated ICC regulations to collect full filed tariff rate because "such 'equities' as may exist by virtue of the carrier's ... violation [of the regulations] ... *are insufficient in magnitude* to overcome the time-honored" filed tariff obligation) (emphasis added); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 583 n. 13, 101 S.Ct. 2925, 2933 n. 13, 69 L.Ed.2d 856 (1981) (stating, in case involving Federal Energy Regulatory Commission, "We save for another day the question whether the filed rate doctrine applies in the face of fraudulent conduct"); *Hewitt–Robins, Inc. v. Eastern Freight–Ways, Inc.,* 371 U.S. 84, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962) (holding that carrier who misroutes goods is not entitled to full tariff rate); *Western Pac., supra* (carrier is not entitled to collect "unreasonably high" rate); *Consolidated Freightways Corp. v. Admiral Corp.,* 442 F.2d 56 (7th Cir.1971) (estopping a carrier that made false statements from collecting filed tariff

rate), *cited with approval, Southern Pac. Transp. Co.,* 456 U.S. at 346–47, 102 S.Ct. at 1822–23; *United States v. Mason & Dixon Lines,* 222 F.2d 646 (6th Cir.1955) (same). We base our decision primarily, however, upon three important sets of *changes* that have taken place since many of the "filed rate" cases were decided, changes that, in our view, compel a different legal result.

First, and perhaps most important, the agency's position has changed. A chief goal of the original Interstate Commerce Act of 1887, c. 104, 24 Stat. 379, was to eliminate "favoritism," *see New Haven R.R.,* 200 U.S. at 391–92, 26 S.Ct. at 276–77; S.Rep. No. 46, 49th Cong., 1st Sess. 181, 188–90, 198–200, 215 (1886), and the courts that decided the seminal "filed rate" cases were attempting to advance that goal. These courts had no reason to think the ICC disagreed with their approach; on the contrary, they had reason to believe their decisions were consistent with the agency's determination of how best to fulfill Congress's mandate. *See, e.g., Suffern v. I.D. & W. Ry. Co.,* 7 I.C.C. 255, 278–79 (1897). We, on the other hand, face a pair of carefully considered agency determinations that the practice in question here may be "unreasonable." *See Negotiated Rates II, supra; Negotiated Rates I, supra.* Those determinations rest, in turn, upon other agency determinations enhancing price competition among truckers. *See, e.g., Short Notice Effectiveness for Independently Filed Rates,* 1 I.C.C.2d 146 (1984) (permitting independently filed tariffs to take effect after one day), *aff'd sub nom., Southern Motor Carriers Rate Conf. v. United States,* 773 F.2d 1561 (11th Cir. 1985); *Lawfulness of Vol. Discount Rates—Motor Common Carriers,* 365 I.C.C. 711 (1982) (permitting common carriers to offer discount rates on volume shipments); *Rates for a Named Shipper or Receiver,* 367 I.C.C. 959 (1984) (permitting common carriers to offer discount rates to individual shippers). The ICC believes that this enhanced competition will adequately protect potentially "disfavored" shippers from discrimination, *see Negotiated Rates II,* 5 I.C.C.2d at 632, and it believes that

overly strict application of the "filed rate" doctrine will harm both shippers and consumers, *see Negotiated Rates I*, 3 I.C.C.2d at 106 (predicting that inflexible enforcement of the filed rate doctrine will thwart the congressional intention to "encourage price innovation" by "chill[ing] rate negotiation between shippers and carriers and inhibit[ing] legitimate pricing initiatives").

■ We consider this change in ICC policy highly significant. Congress created the ICC—an expert body—to make the detailed, specific decisions needed to effectuate the ICA's purposes, thereby substituting administrative regulation for judicial regulation of the shipping industry. *Cf. Abilene Cotton*, 204 U.S. at 435–48, 27 S.Ct. at 353–58. To fulfill its mandate, the ICC must have considerable legal authority to decide what "practice[s]" are "reasonable," 49 U.S.C. § 10701(a), as well as considerable authority to determine the legal scope of those two highly general statutory words. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.*, 888 F.2d 180, 185 (1st Cir.1989) (use of highly general words in statute typically reflects Congressional intention to give agency broad interpretive authority). The ICC's new position, outlined in *Negotiated Rates I & II, supra*, represents an exercise of this authority that deserves due respect from a court. *Cf. Clinchfield Coal Co. v. Federal Mine Safety and Health Comm'n*, 895 F.2d 773, 777–78 (D.C.Cir.1990) (prior court decision finding one interpretation of ambiguous regulatory statute to be "the better reading" does not prevent agency from subsequently adopting a different reasonable reading).

Second, industrial, economic and regulatory circumstances have changed significantly in the decades since the seminal "filed rate" cases were decided, and they have changed in a way that explains *why* the ICC might have considered it necessary to modify its own "filed tariff rate" practice. Strict filed-tariff rules originated in cases that concerned *railroads*, an industry where, at least during the early part of this century, the power to create rate differences was likely to include the power to cause serious harm through favoritism. As commentators have explained, railways have (or had) huge, non-repeatable fixed costs (*e.g.*, rights of way, tracks) and comparatively small variable costs (*e.g.*, trains, fuel, labor). *See* A. Kahn, I *The Economics of Regulation* 161 (1988) [hereinafter *A. Kahn*]. Regulatory bodies struggled with the problem of devising rate structures that fairly "divided" these huge fixed costs among the tens of thousands of separate transportation services that the railroads offered. They recognized that the railroads had an economic incentive not to charge, say, Washington state apple growers, rates that produced less than the revenue sufficient to cover the (imagine $1 million) costs of trains, fuel, and labor needed to transport their apples. But, they asked, how should the railroads divide up the (imagine, much larger $50 million) costs of the tracks and rights-of-way running to the state of Washington? The railroad, if left on its own, might answer this question in a host of different ways, many of which could have nothing to do with the comparative costs of serving different orchards or apple-growing districts, yet each of which might threaten (through non-cost-justified favoritism of some growers but not others) to devastate individual apple growers, apple-growing districts or even the entire state of Washington. *See id.* at 166–68; *cf. S.Rep. No. 46* at 215 ("the paramount evil chargeable against the operation of the transportation system of the United States as now conducted is unjust discrimination between persons, places, commodities, or particular descriptions of traffic."). The ICC's traditional non-cost-related, "fixed cost division" method—permitting the railroads to charge higher rates to shippers of more valuable commodities, *see* I *A. Kahn* at 156—created an incentive for secret rebates, indicating a need to interpret the "filed tariff" statute strictly in order to achieve Congress's basic non-favoritism

purpose. Truckers, in contrast, typically have low fixed costs, *see id.* at 161, and, hence, the regulatory problem of how to divide those costs while avoiding undesirable "favoritism" is not as serious or difficult.

Against this economic regulatory background, the ICC, acting pursuant to an amended statute, *see* Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 793, has substantially increased the number of regulated truckers, *compare* ICC 1980 Annual Report at 122, App. E, Table 1 (approximately 20,000 carriers in 1980) *with* ICC 1988 Annual Report at 141, App. E, Table 1 (over 40,000 carriers in 1988); it has lifted route and cargo restrictions, *see Acceptable Forms of Requests for Operating Authority*, 133 M.C.C. 329 (1980), *rev'd in part on other grounds, American Trucking Ass'ns v. ICC*, 659 F.2d 452 (5th Cir.1981), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983); and it has consequently and deliberately sparked fierce competition in the trucking industry, *see generally* Office of Transportation Analysis, Interstate Commerce Commission, *Highlights of Activity in the Property Motor Carrier Industry* (1990). Because price competition tends to bring prices into line with costs, a trucker facing price competition may find it much more difficult significantly to "disfavor" particular shippers by charging them more than the cost of serving them. *See Negotiated Rates II*, 5 I.C.C.2d at 632 ("Shippers in today's marketplace are protected from unreasonable discrimination by vigorous competition"). If a trucker tries to "disfavor" a shipper by charging it an excessive rate, another trucker, eager for the business, may charge the "disfavored" shipper a lower rate.

In the new, competitive trucking marketplace, therefore, it is understandable why the Commission might find it less necessary than in the past to rely upon a very strict interpretation of the "filed tariff" statute to protect shippers from harm. *See* 5 I.C.C.2d at 625 ("In the more competitive, more flexible pricing atmosphere created by 1980 deregulatory legislation … there is little likelihood of carriers using a rate misquotation as a means to discriminate in favor of particular shippers."). Indeed, an extremely strict interpretation might actually harm shippers. As the ICC points out, "[h]undreds, or even thousands, of individual motor common carrier rates are now negotiated daily," *Negotiated Rates II*, 5 I.C.C.2d at 633; those rates can take effect on one day's notice, *see* 49 C.F.R. § 1312.4(e) (1989); a shipper may find it difficult, on such short notice, to check whether or not the carrier has actually filed the new rate; the shipper may therefore fear to do business with a new carrier (knowing that if the carrier's quoted rates are unfiled, the carrier can collect the higher, filed rate years later); hence, the shipper (and its customers) may lose the benefits of the newer, lower, more competitive prices that the ICC's competitively based, regulatory system promises.

These economic, industrial, and regulatory changes, along with the ICC's plausible explanation of what they mean, counsel deference to the ICC's view that a carrier's rate-collection "practice" can be "[un]reasonable" within the meaning of the statute, 49 U.S.C. § 10701(a). After all, responding to changes such as these is one of the agency's functions. *Cf. American Trucking Ass'ns, Inc. v. Atchison, T. & S.F. Ry. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967) (an agency has both the authority and the duty to reinterpret its organic statute in light of experience and changing circumstances). We cannot say that the ICC has no plausible basis for its change of policy or that such a change is unreasonable.

Third, the relevant statutes themselves have changed. In 1980, Congress rewrote the national "transportation policy" with respect to motor carriers, instructing the Interstate Commerce Commission "to promote *competitive* and efficient transportation services." *See* Motor Carrier Act of 1980, Pub.L. No. 96–296, § 3(a), 94 Stat. 793, 793 (codified at 49 U.S.C. § 10101(a)(2)). It amended the statute to permit an increase in the number of truckers, *see id.* § 5(a), 94 Stat. at 794–96 (codified at 49 U.S.C. § 10922(b)), decrease route and cargo restrictions, *see id.* §§ 6, 94 Stat. at 796–77 (codified at 49 U.S.C.

§ 10922(h)), enhance pricing flexibility, *see id.* §§ 10(a)(1), 10(b), 11, 94 Stat. at 799–802 (codified at 49 U.S.C. §§ 10102(12), 10930(a), 10708(d)) and limit collective rate-making, *see id.* § 14(a), 94 Stat. at 803–06 (codified at 49 U.S.C. § 10706(b)). Congress acted after hearing testimony that classically rigid rate regulation harmed consumers and that increased reliance upon competition would save billions of dollars per year. *See id.* § 3(a) (reviewing negative effects of protective regulation on the motor carrier industry); H.R.Rep. No. 1069, 96th Cong., 2d Sess. 7, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2289 (testimony that classical trucking regulation cost consumers approximately $5 billion per year) [hereinafter *House Report, USCCAN*]. According to the 1980 Act's legislative history, Congress expected the Commission "to overhaul outmoded and archaic regulatory mechanisms," *House Report* at 2, *USCCAN* at 2284, and to "recognize the importance of competition and efficiency in motor carrier operations as the most desirable means for achieving national transportation goals and objectives," *House Report* at 12, *USCCAN* at 2294. *See also Square D v. Niagara Frontier Tariff Bureau,* 760 F.2d 1347, 1355 (2d Cir.1985) ("Exposing ratemaking to competitive forces to as great an extent as possible was among the most significant" goals of the 1980 Act (citing *House Report* at 3–4, *USCCAN* at 2285–86)), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

We recognize that Congress *did not* change the specific language of 49 U.S.C. §§ 10761(a) & 10701(a), the specific statutory provisions here in question. But Congress *did* make fundamental changes in the Act's objectives. In light of these changes, its failure to change the language of those two provisions, particularly the highly general language of § 10701(a), does not mean Congress intended to freeze into place every prior judicial statement interpreting that language, or (more to the point) to prevent the Commission itself from interpreting highly general statutory language in the light of new circumstances and new statutory purposes. For one thing, the House Report says that "The

National Transportation Policy," which Congress amended to call for a competitive trucking industry, *see* 49 U.S.C. § 10101(a)(2), "sets the tone for the regulatory structure and is the basis for determining the meaning of statutory provisions." *House Report* at 11–12, *USCCAN* at 2293–94. For another thing, courts have found new meaning in reenacted statutory language in circumstances involving less radical change than is at issue here. *See, e.g., United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 340–49, 83 S.Ct. 1715, 1729–33, 10 L.Ed.2d 915 (1963) (holding that Congress expanded the scope of the words "acquire ... stock" in § 7 of the Clayton Act, 15 U.S.C. § 18, when it revised the purposes of that statute in the Act of December 29, 1950 (Celler–Kefauver Antimerger Act), ch. 1184, 64 Stat. 1125–26). In this case, moreover, the highly general language of § 10701(a) suggests a Congressional intent to permit interpretations that change flexibly with changing circumstances, at least where, as here, the change proposed is somewhat marginal, does not flatly contradict prior case law, and departs, at most, only from the "spirit" of older judicial language, written under different circumstances. *See* Sunstein, *Interpreting Statutes in the Regulatory State,* 103 Harv.L.Rev. 405, 493–97 (1989). To hold that, under all circumstances, Congressional reenactment of such general language automatically freezes into place all prior judicial interpretations, irrespective of the purposes of the rest of the newly reenacted statute, would impose upon Congress the obligation of reading every old case whenever it reenacts general language in a statute—an obligation that, from a practical point of view, is impossible to meet, and that, from a jurisprudential point of view, would inhibit the development of coherent statutory law.

In sum, given that the statute, literally speaking, permits the interpretation the ICC would give it; that prior judicial constructions of the statute do not absolutely foreclose that interpretation; and that three sets of important changes (in ICC policy, in the underlying background regulatory circumstances, and in the statute itself) have occurred, we conclude that the ICC has the legal power to hold the type of

**112**

conduct here at issue to be an "[un]reasonable" "practice." 49 U.S.C. § 10701(a). That being so, the ICC has "primary jurisdiction" to determine whether, given the particular facts of this case, the conduct at issue is, in fact, not "reasonable."

On remand, the district court must stay proceedings in this case and refer it to the Interstate Commerce Commission.

*So ordered.*

### ORDER

Entered: July 19, 1990

In light of the Supreme Court's decision in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* —— U.S. ——, 110 S.Ct. 2759, —— L.Ed.2d —— (1990), holding that collection of an unfiled negotiated rate is not an unreasonable practice, 49 U.S.C. § 10701, we hereby modify our earlier decision in this case by vacating the district court's decision solely for the reasons set forth in Section "A" of our earlier opinion, *supra,* 101, 104–07. On remand, the district court shall act in accordance with Section "A". Section "B" of our earlier opinion, *supra,* at 107–12, is hereby withdrawn.