864 F.2d 388
 In the Matter of CARAVAN REFRIGERATED CARGO, INC., Debtor,
SUPREME BEEF PROCESSORS, INC., Appellant,
v.
Robert YAQUINTO, Jr., Trustee for Caravan Refrigerated
Cargo, Inc., Appellee.
 No. 88-1209.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 2, 1989.
Rehearing and Rehearing En Banc Denied March 1, 1989.
 
 J. Michael Weston, Dallas, Tex., John W. Bryant, Eames, Wilcox, Mastej and Bryant, Detroit, Mich., for appellant.
 Louis J. Wade, Culp & Wade, Kansas City, Mo., Robert Yaquinto, Jr., Dallas, Tex., for appellee.
 Appeal from the United States District Court for the Northern District of Texas.
 Before REAVLEY, HIGGINBOTHAM, and SMITH, Circuit Judges.
 JERRY E. SMITH, Circuit Judge:
 
 
 1
 This is an archetypal "negotiated rate case" involving a motor carrier and a shipper of beef. The well-worn choreography for these cases involves a motor carrier's action against a shipper to collect for undercharges; that is, to collect the difference between the higher rate which the carrier has filed with the Interstate Commerce Commission (the "Commission") and the rate which the parties had negotiated.
 
 
 2
 In the action before us, the district court refused to refer the case to the Commission and granted summary judgment for the carrier over the shipper's objection that the filed tariff was unreasonable. The shipper sought the district court's reconsideration on the ground that its business with the carrier was at the behest of the government, but the court refused to reconsider. Agreeing with the district court that summary judgment was appropriate and that the motion for reconsideration was properly denied, we affirm.
 
 
 3
 I. A Great Deal While It Lasted.
 
 
 4
 Supreme Beef Processors, Inc. ("Supreme Beef"), is a major producer and supplier of beef products to the United States Government. Caravan Refrigerated Cargo, Inc. ("Caravan"), supplied refrigerated transport services to Supreme Beef for several years prior to Caravan's bankruptcy. According to Supreme Beef, it had a long-standing agreement with Caravan that Caravan would "meet or beat" any motor carrier rate quoted by a competing carrier. This agreement enabled Supreme Beef to rely upon low-cost transportation for purposes of preparing its bids. In return, Caravan was guaranteed a large volume of shipping business from Supreme Beef.
 
 
 5
 During their relationship, Supreme Beef and Caravan continually negotiated the transportation rates to assure competitiveness with other carriers' rates. Caravan billed Supreme Beef for the agreed rates, and Supreme Beef paid those bills. The negotiated rates for the shipments in question here, however, were not the same as those that Caravan had filed with the Commission: The filed rates were higher. From the summary judgment record, it appears that Supreme Beef was unaware of the variance, and had relied upon Caravan's rate quotations. After Caravan's bankruptcy, the trustee filed the instant suit to collect from Supreme Beef the difference between the negotiated rates and the filed rates for those periods during which Caravan did not have the actual, negotiated rates on file; the parties agree that the difference amounts to $70,227.08.
 
 
 6
 On appeal, Supreme Beef contends that the court erred in failing to refer the case to the Commission, where it could contest the reasonableness of the filed rates, or in the alternative, to deny the summary judgment motion on the basis of Supreme Beef's defense of unreasonableness. Supreme Beef also urges that we find error in the district court's refusal to vacate the summary judgment order after Supreme Beef had presented factual evidence as to the government-carrier exemption.
 
 
 7
 II. Where's the Beef?
 
 
 8
 Supreme Beef's first contention is that this case was litigated in the wrong forum. It invokes the primary jurisdiction doctrine and contends that the district court should have referred the dispute to the Commission in the interests of uniformity and expert administration of issues of transportation policy. See United States v. Western Pac. R.R., 352 U.S. 59, 65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).
 
 
 9
 Under the primary jurisdiction doctrine, "a district court trying a case under the Interstate Commerce Act must, if presented with such an issue, stay its proceedings and refer the case to the Commission." City of New Orleans v. Southern Scrap Material Co., 704 F.2d 755, 758 (5th Cir.1983) (citing ICC v. Atlantic Coast Line Ry., 383 U.S. 576, 579, 86 S.Ct. 1000, 1003, 16 L.Ed.2d 109 (1966)). In addition, we have stated that when "the reasonableness of a rate is at issue, 'there must be preliminary resort to the Commission.' " Southern Pac. Transp. Co. v. City of San Antonio, 748 F.2d 266, 272 (5th Cir.1984) (quoting Great N. Ry. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922)). Supreme Beef thus contends that because Caravan's suit was based upon section 10761(a) of the Interstate Commerce Act, and because it properly pled unreasonableness as a defense, the district court was required to refer the case.
 
 
 10
 Here, however, the facts do not raise technical or complex issues, regarding appropriate rates, that require the expert administration of the Commission and thereby invoke the primary jurisdiction doctrine. Supreme Beef bases its charges of unreasonableness upon the unfairness of having to pay the filed rate because Caravan "failed to get its paperwork done." In reality, this dispute concerns only the applicability of 49 U.S.C. Sec. 10761(a), which provides that a carrier subject to the jurisdiction of the Commission "may not charge or receive a different compensation for ... transportation or service than the rate specified in the tariff."[1] The purpose of this statute is to prevent large suppliers and shippers from negotiating "under-the-table" tariffs, lower than the filed tariffs, and thus undercutting competition from smaller suppliers who must also use the highways of interstate commerce to get their goods to market.
 
 
 11
 Judicial interpretations of section 10761(a) and its predecessors have given rise to the "filed tariff doctrine," which Justice Brandeis ably explained as follows:
 
 
 12
 The rate of a carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it.... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. The rule is undeniably strict, and it may work hardship in some cases, but it embodies the policy which has been adopted by Congress in regulation of interstate commerce in order to prevent unjust discrimination.
 
 
 13
 Louisville & Nashville Ry. v. Maxwell, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).
 
 
 14
 Supreme Beef contends, however, that the filed tariff doctrine has been weakened and that the district court should have referred the case so that it could contest the reasonableness of Caravan's filed rates in light of Caravan's misquotations. As support for its argument, Supreme Beef cites the Motor Carrier Act of 1980; an advisory opinion from the Commission, National Indus. Transp. League (Ex parte MC-177), 3 I.C.C.2d 99, 86 Fed.Carr.Cas. (CCH) p 37,284 (Aug. 7, 1987); and a recent Eleventh Circuit opinion upholding a Commission ruling that a carrier had engaged in an unreasonable practice by misquoting rates to the shipper.[2]
 
 
 15
 Supreme Beef's claim is that with the Motor Carrier Act, Congress sought to make the industry more competitive by reducing the burden which filing tariffs imposes and that the Commission recognized this change when it declared in its advisory opinion that "equitable defenses to rigid application of filed tariff rates should be available on a case-by-case basis." Moreover, as the Seaboard System case demonstrates, a circuit court of appeals has approved the Commission's willingness to find that misquotation constitutes an unreasonable practice. We respond to each of these authorities in turn.
 
 
 16
 A. The Motor Carrier Act.
 
 
 17
 We cannot agree that the 1980 Act abrogates the filed tariff doctrine, as we cannot ignore the plain fact that when Congress examined this area in 1980, it did so in light of section 10761(a) and the long-standing judicial interpretations of that statute. In fact, the changes which Congress did make, a filing exemption for contract carriers, for example,[3] indicate that its intent was to leave the filed tariff doctrine very much intact. Any change in the law must therefore come from Congress, not this court.
 
 
 18
 In an analogous context, the Supreme Court has refused to overturn doctrine established prior to the Motor Carrier Act which Congress did not expressly abrogate. In Square D Co. v. Niagara Frontier Tariff Bureau, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Court upheld its previous ruling inKeogh v. Chicago & Northwestern Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Under the "Keogh doctrine," shippers could not bring treble-damage antitrust actions against carriers in connection with filed tariffs, though governmental and injunctive antitrust actions against "concerted rate-making" activities were still available. Answering the argument that the Keogh doctrine should be overturned in light of Congress's intent to promote competition in the transportation industry through the Motor Carrier Act, Justice Stevens wrote,
 
 
 19
 [W]e may assume that petitioners are correct in arguing that the Keogh decision was unwise as a matter of policy--but it nevertheless remains true that Congress must be presumed to have been fully cognizant of this interpretation of the statutory scheme, which had been a significant part of our settled law for over half a century, and that Congress did not see fit to change it when Congress carefully reexamined this area of law in 1980.
 
 
 20
 Square D, 476 U.S. at 420, 106 S.Ct. at 1928.
 
 
 21
 The facts here present an even more persuasive case for deference. One of the Motor Carrier Act's most significant changes creates an exemption from filing requirements for contract carriers, evincing Congress's desire that all other carriers should continue to adhere to the filing requirements. Moreover, section 10761(a) and the filed tariff doctrine, integral as they are to the publication and enforcement of reasonable, non-discriminatory rates, are not so obviously unwise and anti-competitive as Justice Stevens seems to suggest the Keogh doctrine may be. Thus, following the Supreme Court's lead in Square D, we are unwilling to permit Supreme Beef's unreasonableness defense to undermine the filed tariff doctrine.
 
 
 22
 B. National Industrial Transportation League.
 
 
 23
 The Commission's advisory opinion in National Industrial Transportation League (Ex parte MC-177) is inapposite to this case. The Commission's expression of its decision to allow equitable defenses in disputes before it regarding the reasonableness of rates has, of course, no binding effect upon this court.[4]
 
 
 24
 Instead, our decision is governed by our opinion in Southern Pacific Transportation Co. v. City of San Antonio. There, we overturned a district court's stay of an execution of judgment by two railroads seeking to collect undercharges for shipments of coal to a city power plant. The district court had granted the stay pending the Commission's determination of the reasonableness of the railroad's filed rates. We stated,
 
 
 25
 The Interstate Commerce Act ... entails a balanced and coherent system for the payment and review of rates. The shipper is required to pay the filed rate at the time of shipment but may later seek review and reparations in the I.C.C. The carrier, on the other hand, receives assurance that payment will not be delayed pending review; but the carrier must be prepared to reimburse amounts later found to be unreasonable.
 
 
 26
 748 F.2d at 274.
 
 
 27
 Thus, our precedent declares that a carrier is entitled to enforce the filed rates under the filed tariff doctrine and to seek payment of undercharges in the district court even while the reasonableness of the tariffs is challenged before the Commission. The rule is necessary to protect the filed tariff doctrine and its underlying policy of ensuring reasonable and non-discriminatory rates.[5]
 
 
 28
 Our decision here is an application of the same rule: A shipper that pleads unreasonableness as a defense cannot prevent enforcement of the filed tariff doctrine or force the district court to stay proceedings and refer the case to the Commission.[6] Any other decision would constitute legislation on our part; it would create an exception that swallows the doctrine and thereby would vitiate a long-standing and notorious policy which Congress has visited and left intact.
 
 
 29
 C. Seaboard System.
 
 
 30
 Supreme Beef would also find support for its referral argument in Seaboard System R.R. v. United States, in which the Eleventh Circuit upheld the Commission's ruling in a negotiated rate case that a carrier had engaged in an unreasonable practice by misquoting rates to a shipper. The Commission therefore refused to permit the carrier to collect for undercharges. The Commission found authority for its ruling in two different statutes: 49 U.S.C. Sec. 10701(a), which provides that a "practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under Chapter 105 of this title must be reasonable," and 49 U.S.C. Sec. 10704(a)(1), which authorizes the Commission to order a carrier to stop a violation.
 
 
 31
 Supreme Beef thus contends that because the Commission is willing to find that misquotation constitutes an unreasonable practice, and because the Eleventh Circuit has recognized the Commission's authority to make such findings, this court also should recognize that authority and hold that it was error for the district court to refuse to submit the case to the Commission in the face of Supreme Beef's allegations of misquotation and unreasonableness.
 
 
 32
 However, Supreme Beef does not tell the whole story of Seaboard System. Central to that case was the Commission's finding that the tariff filed with the Commission and sought to be enforced was not "plain to the ordinary user." 794 F.2d at 637. The importance of this additional finding cannot be understated; under the filed tariff doctrine, shippers are charged with constructive knowledge of the tariffs which the carrier has filed with the Commission. See Maxwell, 237 U.S. at 97, 35 S.Ct. at 495. Thus, it is only when that tariff is unclear or ambiguous to the ordinary user that the Commission is willing to relax the filed tariff doctrine and consider the possibility that misquotation might be an unreasonable practice.
 
 
 33
 Supreme Beef has not claimed nor offered any evidence to show that the rates which Caravan had filed with the Commission were not plain to the ordinary user. Seaboard System therefore offers no support for its contentions of unreasonableness and does not represent a weakening of the filed tariff doctrine.
 
 
 34
 III. Additional Beefs.
 
 
 35
 Supreme Beef charges that the district court's summary judgment order was in error on two additional grounds. First, it argues that the trustee's cross-motion for summary judgment was untimely in light of the district court's having set the deadlines for such motions, pursuant to Fed.R.Civ.P. 16(b), at December 15, 1987. The trustee filed his cross-motion on December 29, 1987. Second, it asserts that its motion for reconsideration presented triable issues of fact as to Caravan's special status as a carrier of government goods.
 
 
 36
 In making this first argument, Supreme Beef ignores the fact that a district court may grant summary judgment for the non-movant sua sponte. We have noted that when "one party moves for summary judgment the district court, in an appropriate case, may grant summary judgment against the movant, even though the opposite party has not actually filed a motion for summary judgment." Landry v. G.B.A., 762 F.2d 462, 464 (5th Cir.1985) (citing 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil 2d Sec. 2720)). The cited treatise explain that granting summary judgment in favor of the non-moving party is
 
 
 37
 in keeping with the objective of Rule 56 to expedite the disposition of cases, and, somewhat more remotely, with the mandate of Rule 54(c) requiring the court to grant relief to which a party is entitled 'even if the party has not demanded such relief in his pleadings.'
 
 
 38
 10A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure: Civil 2d Sec. 2720 at 33 (quoting Fed.R.Civ.P. 54(c)). We see no reason why the same reasoning should not apply in a situation where, as here, the non-movant has failed to meet a motion deadline.
 
 
 39
 Second, Supreme Beef makes the argument that had the district court considered the fact that Caravan held a Master Certificate of Public Convenience exempting it, as a carrier of government goods, from normal filing requirements,[7] the court then would have had to enforce the negotiated rate rather than the filed rate. However, Supreme Beef failed to call the court's attention to this argument in its motion for summary judgment. It raised the point for the first time in its motion for reconsideration.
 
 
 40
 We note that a motion to reconsider or amend should not be employed "to introduce evidence that was available at trial but was not proffered, to relitigate old issues, to advance new theories, or to secure a rehearing on the merits." Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1219 (5th Cir.1986). Our review of the record indicates that Supreme Beef made no showing that it had newly discovered the evidence it presented regarding the government contracts, nor did it bring that evidence to the court's attention prior to summary judgment, or marshal legal support for its government-exemption claim.
 
 
 41
 Thus, Supreme Beef's motion for reconsideration was nothing more than an attempt to present a new legal theory to the court on the basis of affidavits it already had submitted with its original summary judgment motion. The district court therefore properly denied the motion for reconsideration.
 
 
 42
 IV. Conclusion.
 
 
 43
 Supreme Beef has failed to persuade us that we should weaken the filed tariff doctrine by holding that a defense of unreasonableness will trigger a referral to the Commission. Nor has it demonstrated that the district court acted improperly in granting summary judgment for Caravan and denying the motion for reconsideration. Hence, the district court's summary judgment order is in all respects AFFIRMED.
 
 
 
 [1]
 Section 10761(a) provides in full:
 (a) Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device.
 
 
 [2]
 See Seaboard Sys. R.R. v. United States, 794 F.2d 635, 537 (11th Cir.1986)
 
 
 [3]
 See 49 U.S.C. Sec. 10761(b), which provides that "[t]he Commission may grant relief from subsection (a) of this section when relief is consistent with the public interest and ... transportation policy." Contract carriers are those carriers that, like Caravan, have established a contractual arrangement with a shipper and that must adjust rates more quickly than the normal filing process permits
 
 
 [4]
 See Pacific Gas & Elec. Co. v. Federal Power Comm'n, 506 F.2d 33 (D.C.Cir.1974). The court noted, "[A] general statement of policy only announces what the agency seeks to establish as policy.... When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued." Id. at 38 (footnote omitted)
 
 
 [5]
 See id.; see also Regular Common Carrier Conference v. United States, 793 F.2d 376, 379 (D.C.Cir.1986). There, the court declared invalid a Commission regulation that would have allowed motor carriers to leave a "paper-trail" of negotiated tariffs with shippers rather than file tariffs with the Commission. Judge (now Justice) Scalia explained further the policy behind the requirement that shippers and carriers adhere to the filed tariffs:
 That requirement is utterly central to the [Interstate Commerce] Act. Without it, for example, it would be monumentally difficult to enforce the requirement that rates be reasonable and non-discriminatory, see 49 U.S.C. Secs. 10701 & 10741(b), and virtually impossible for the public to assert its right to challenge the lawfulness of existing or proposed rates, see 49 U.S.C. Secs. 10708(a)(1) & 11701(a).
 
 
 [6]
 Supreme Beef's attempt to distinguish Southern Pac. Transp. Co. v. City of San Antonio is unpersuasive. It observes that the case involved the reasonableness of railroad rates rather than motor carrier rates and points out that the Commission has long reviewed the reasonableness of railroad rates, while only recently having decided, via its advisory opinion in National Indus. Transp. League, to review the reasonableness of motor carrier rates. This distinction, however, only serves to strengthen the precedential value of Southern Pacific in the present context. Again, the rule stated in that case is that a court may not stay enforcement of the filed tariff rate on the ground that the shipper has pled unreasonableness or sought a hearing before the Commission. Thus, regardless of whether the Commission is willing to consider the reasonableness of motor carrier or railroad rates, the court may not put the brakes on the filed tariff doctrine
 
 
 [7]
 See 49 U.S.C. Sec. 10721