United States Court of Appeals,

Fifth Circuit.

Nos. 92-4160, 92-4201.

In the Matter of STEVE D. THOMPSON TRUCKING, INC., Debtor.  (Two Cases).

Billy R. VINING, Trustee, Appellee,

v.

ROCK WOOL MANUFACTURING COMPANY, Appellant.

Billy R. VINING, Trustee, Appellee,

v.

MAKITA, U.S.A., INC., Appellant.

May 7, 1993.

Appeals from the United States District Court for the Western District of Louisiana.

Before REYNALDO G. GARZA, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

These two cases were styled differently and scheduled for oral argument consecutively. Although we did not hear oral argument in *Vining v. Rock Wool,* No. 92-4160, we have consolidated these two cases and dispose of them together in the following opinion.

Rock Wool appeals from a summary judgment entered by the district court for freight undercharges.  The district court denied Rock Wool the opportunity to assert the counterclaim of rate unreasonableness in the plaintiff's undercharge action.  However, the court did not make an "express determination" required under Rule 54(b) for entry of a separate judgment.  Further, because the district court did not transfer the issue of tariff unreasonableness to the ICC under the primary jurisdiction doctrine on remand it must either make such an express determination or refer the issue of reasonableness to the ICC.

Makita also appeals an adverse summary judgment entered by the district court for freight undercharges.  We find that the summary judgment was entered improperly in two respects.  First, one of the four tariffs considered by the trial court appears to be a valid filed discount tariff and

summary judgment as to any shipments made pursuant to that tariff was improper. Secondly, Makita was also improperly denied the opportunity to assert its counterclaim. Therefore, we REVERSE the district court's entry of summary judgment as to both Makita and Rock Wool and REMAND both cases consistent with the following opinion.

## I. FACTS

On August 30, 1989, Steven D. Thompson Trucking, Inc. ("Thompson") filed for Chapter 11 bankruptcy. Subsequently, the case was converted to a chapter 7 bankruptcy at which time Billy R. Vining was appointed trustee of the debtor. Vining, as trustee, filed an adversary proceeding against the defendants, Rock Wool and Makita, to recover freight undercharges.

*a. Rock Wool.*

Thompson and Rock Wool had negotiated rates on interstate transportation that were below the applicable published tariffs. The trustee conducted an audit of Thompson's books and discovered undercharges on previous freight bills to Rock Wool. The audit revealed that Rock Wool had received discounts that were not based on valid filed tariffs with the Interstate Commerce Commission ("ICC"). The 35 audited freight bills totalled $7,950.59 in undercharges. The trustee commenced this action seeking to recover the difference between the contracted rate and the higher filed tariff rate because under the filed rate doctrine,[1] carriers are not permitted to vary from the tariff

---

[1]The classic formulation of the "filed rate doctrine" is found in *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915). In *Maxwell,* the court stated:

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. The rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce to prevent unjust discrimination.

*Id.*

> *In Maxwell,* the Supreme Court held that a passenger who purchased a train ticket at a rate misquoted by the ticket agent did not have a defense against imposition of the higher tariff by the railroad. *See* id. at 97, 35 S.Ct. at 495; *see also Kansas City S. Ry. Co. v. Carl,* 227 U.S. 639, 653, 33 S.Ct. 391, 395, 57 L.Ed. 683 (1913) (even intentional misstatement of applicable published rate will not bind the carrier or shipper).

rate.

*b. Makita.*

Makita and Thompson had negotiated rates on interstate transportation that were below the applicable published tariffs. The trustee conducted an audit of Thompson's books and discovered undercharges on previous freight bills to Makita. The audit revealed that Makita had received discounts that were not based on valid filed tariffs with the Interstate Commerce Commission ("ICC"). Makita's audited freight bills totalled $17,697.85 in undercharges.

## II. PROCEDURE

The bankruptcy court found that Vining was entitled to a judgment for $7,950.59 plus interest from Rock Wool. The court also found that Vining was entitled to a judgment for $17,697.85 plus interest from Makita. The court determined that both Rock Wool and Makita had contracted with Thompson in violation of the filed rate doctrine at an unpublished discount rate. Therefore, the court assessed undercharges against both of them, which were calculated by deducting the amount they had actually paid from the higher applicable published tariff.

Rock Wool and Makita contended that: (a) Thompson should be estopped from varying from its negotiated rate; (b) the tariff rate to be applied was unreasonable; and (c) certain documents were inadmissible copies of originals. Rock Wool alone contended that: (d) it and Thompson were engaged in contract carriage and, thus, was exempt from the filed tariff rate. Makita alone contended that: (e) the discount rates that it paid were on file with the ICC.

*a. Estoppel.*

The bankruptcy court rejected the equitable defenses raised by the defendants out of hand. The court reasoned that equitable defenses, such as estoppel, were not available in the face of the inflexible, unyielding filed rate doctrine. *See, e.g., Armour Packing Co. v. United States,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908) ("If the rates are subject to secret alteration by special agreement, then the statute will fail of its purpose"); *see also Illinois Cent. Gulf R.R. Co. v. Golden Triangle Wholesale Gas Co.,* 586 F.2d 588, 592 (5th Cir.1978) (rejecting estoppel defense, storage charges in tariff applied despite repeated assurances by carrier that they would not apply). The court

proceeded to note that even intentional or fraudulent misquotation of the rate will not provide the defendant with a defense to the filed rate. *See Paulson v. Greyhound Lines, Inc.,* 628 F.Supp. 888, 892 (D.Minn.) (*citing Pittsburgh, Cincinnati, Chicago & St. Louis R.R. Co. v. Fink,* 250 U.S. 577, 581, 40 S.Ct. 27, 27, 63 L.Ed. 1151 (1919)) (shipper is conclusively presumed to know the terms of the published tariff), *aff'd,* 804 F.2d 506 (8th Cir.1986).

*b. Tariff Unreasonableness.*

Next, Rock Wool and Makita both contended that the tariffs used in computing their undercharges were unreasonable. The court rejected their contention, holding that the only available avenue to challenge the reasonableness of a carrier's rate is to pay the overcharges and then commence a reparations action before the ICC. *See* 49 U.S.C. § 11705(b)(3). The court based its decision in this regard on *Matter of Caravan Refrigerated Cargo, Inc.,* 864 F.2d 388, 391 (5th Cir.1989), *cert. denied,* 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990).[2] Moreover, the court stated: "[e]ven if the unreasonableness of the debtor's rates would have been a defense in this action, defendant completely failed to show that there existed any issue of material fact concerning the reasonableness or the applicability of the rates in the tariffs utilized in reaching the amount of the undercharges."

*c. Admissibility of Photocopies.*

Rock Wool and Makita also contended that certain documents were not originals or were not authenticated. However, the bankruptcy court rejected this contention because both parties failed to allege that any of the documents were not accurate copies or that the tariffs were not complete and accurate. *See* Fed.R.Evid. 1003.

*d. Contract Carriage.*

Rock Wool contended before the court below that Thompson was a motor *contract* carrier

---

[2]The Fifth Circuit overruled *Caravan* in *Advance United Expressways, Inc. v. Eastman Kodak Co.,* 965 F.2d 1347, 1352 (5th Cir.1992). In *Advance United,* a panel of our court decided that *Maislin Indus. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) superseded *Caravan. See Advance United,* 965 F.2d at 1352.

rather than a motor *common* carrier.[3] As was provided in 49 C.F.R. § 1053.1,[4] the I.C.C. formulated a multi-part test that needed to be met in order to attain motor *contract* carrier status:

> Contracts or agreements to be in writing
>
> No contract carrier by motor vehicle, as defined in 49 U.S.C. 10102(12) shall transport property for hire in interstate or foreign commerce except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments, and copies of which contracts or agreements shall be preserved by the carriers parties thereto so long as such contracts or agreements are in force and for at least one year thereafter.

49 C.F.R. § 1053.1 (1991).

The bankruptcy court noted that the transportation agreement was an ineffectual attempt at contract carriage that was never intended to be filed with the ICC. The court rejected Rock Wool's claim that Thompson was a contract carrier because: (i) there was no assignment of vehicles for any period of time for the exclusive use of the shipper; (ii) there was nothing in the agreement to indicate that it is designed to meet the distinct needs of the shipper; (iii) the contract was not bilateral because there was no obligation upon any of the shippers: "Rock Wool was obligated to do virtually nothing under the agreement;" (iv) there was no specific obligation on any shipper, all the obligations were on the carrier; and (v) the agreement failed to cover a series of shipments during a stated period of time.

The court found that Rock Wool had only met one requirement, that the agreement be in writing. Therefore, the court held that the transportation agreement failed to meet the requirements of 49 U.S.C. § 10102(15)[5] and 49 C.F.R. § 1053.1 (1991). Consequently, the court concluded that

---

[3]Motor *contract* carriers are not subject to the filed tariff structure, while motor *common* carriers must comply with the filed tariff.

[4]Effective June 20, 1992, the I.C.C. repealed 49 C.F.R. § 1053.1 in an effort to reduce the overly technical requirements needed to attain motor contract carriage status. *See* Contracts for Transportation of Property, 57 Fed.Reg. 21616-01 (I.C.C.1992).

[5]49 U.S.C. § 10102(15) provides:

> "motor contract carrier" means—(A) a person, other than a motor common carrier, providing motor vehicle transportation of passengers for compensation under continuing agreements with a person or a limited number of persons—(i) by assigning

Thompson was not a motor *contract* carrier and was required to comply with the filed tariffs.

*e. Valid Filed Tariff.*

Makita argued that it and Thompson contracted at discount rates that were on file with the ICC. In support of its position, Makita presented four filed tariff sheets. Three of the four tariffs provide:

> The discount named in this Item is applicable only on shipments from shippers which are participants in the provisions of the Item. Each shipper desiring to participate in the provisions of the Item must notify in writing by certified mail, the Traffic Manager of Steve D. Thompson Trucking, Inc., ... of its desire to participate and must specify this item by number. The shipper will receive an acknowledgment in writing from the Traffic Manager of Steve D. Thompson Trucking, Inc. advising it of the date on which its participation is to be effective.[6]

The fourth tariff sheet, ICC THST 100, Item 7510 New (R), effective May 23, contained no such participation requirement and indicated on its face that it applied to Makita shipments. The court below concluded that Makita failed to prove that it was a participant under a valid filed discount tariff. Therefore, the court found that the negotiated rates of transportation were in violation of the filed tariff doctrine.

The bankruptcy court granted summary judgment in favor of Vining as trustee against both Rock Wool and Makita. Both parties then appealed to the district court. The district court affirmed the judgment of the bankruptcy court without much analysis. Rock Wool and Makita now appeal.

### III. DISCUSSION

There are numerous issues raised on appeal: (a) does new Ex Parte No. MC-208[7] apply, and if so, then is the rule valid; (b) did the court below properly deny Rock Wool and Makita the

---

> motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person; and (B) a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person.

> *Id.*

[6] ICC THST 102, Items 4530, 4545, 5050 New (R).

[7] *See* Nonoperating Motor Carriers—Collection of Undercharges, 8 I.C.C.2d 742 (1992).

opportunity to assert rate unreasonableness as a counterclaim; (c) were Rock Wool and Thompson exempt from the filed tariffs because they were engaged in contract carriage; (d) were Makita and Thompson participating in valid filed discount tariffs; (e) did the trustee sufficiently prove entitlement to relief; and (f) was the trustee entitled to pre-judgment interest.

We find that MC-208 does not apply in Rock Wool's case. Further, as to Makita, the court below must make factual findings before the rule will be implicated. Consequently, we need not confront the rule's validity at this juncture. The court improperly denied both parties the opportunity to assert tariff unreasonableness as a counterclaim, because it failed to make a Rule 54(b) express determination. Moreover, inquiries into tariff reasonableness should be made by the ICC under the doctrine of primary jurisdiction.

The transportation agreement between Thompson and Rock Wool did not establish motor contract carriage status and, thus, they were required to comply with the filed tariff. As to Makita, of the four tariffs, one tariff appears to facially establish a valid participating tariff. Therefore, summary judgment as to those shipments attributable to the fourth tariff was inappropriate. Consequently, we express no opinion as to either the sufficiency of proof or pre-judgment interest issues. Therefore, the judgment of the district court is REVERSED with instructions to either make a Rule 54(b) "express determination" or transfer the issue of rate reasonableness to the ICC.

*a. Applicability of Ex Parte No. MC-208.*

The new rule, Ex Parte No. MC-208, was enacted to cure the problems that were caused by overzealous trustees who imposed severe costs upon shippers. If the rule applies, then "the carrier or its representative must file its claims with the Commission prior to, or concurrently with, a court action" so that the ICC can make an initial determination. *See* 49 C.F.R. § 1321.1 (1992). The ICC felt that if it could wrest original jurisdiction from the courts to make a threshold determination in undercharge actions involving nonoperating carriers, then shippers would avoid a lot of needless litigation.

The rule expressly applies only to carriers who are in bankruptcy, and whose primary business is the collection of overcharges. Therefore, even carriers who are struggling to survive are not within

the ambit of MC-208. However, the rules do apply to carriers who engage in a token amount of shipping just to avoid the application of MC-208. Moreover, the rule applies to those cases that are currently pending, and cases that arise in the future.

The rules are expressly addressed to two broad categories of undercharge claims: (i) (*situation # 1* ) rebillings applying a different, higher common carrier tariff rate than the tariff rate originally billed. For example, disputes over whether the tariff rate that was originally applied should be replaced wit h an alternative tariff rate,[8] and (ii) (*situation # 2* ) where carriers seek to replace contract carriage terms, that were originally applied to a shipment, with a published tariff rate. For example, where the parties originally operated under a valid contract carriage permit, but now, after the fact, the carrier wants to establish that some portion of its shipments were not made pursuant to the permit, but rather were common carriage shipments subject to the published tariff rate.[9]

Further, the rules do not apply to two types of collection activity: (i) (*situation # 3* ) where the carrier originally charged a non-filed rate and now seeks to bill at the filed rate: the situation addressed in *Maislin;*[10] and (ii) (*situation # 4* ) where the carrier is merely trying to collect unpaid portions of either a billed tariff or contract rate.[11]

### i. Rock Wool.

There are four possible scenarios under the current scheme. Two of the possibilities drop out of our analysis. We are not faced with a situation where Rock Wool paid a published tariff rate and Thompson is trying to apply a different tariff rate and, thus, situation # 1 is not applicable. Further, the carrier is not trying to collect unpaid portions of a shipping bill under situation # 4. Consequently, we are left to determine whether we are in situation # 2 or situation # 3. The ultimate determination between the two situations controls whether or not MC-208 applies to our situation, because if we are in situation # 2 then we are within the rule, and if we are in situation # 3 we are not.

---

[8]*See* Ex Parte No. MC-208 at p. 10.

[9]*See id.*

[10]*See* Ex Parte No. MC-208 at p. 9.

[11]*See id.*

Facially, at least, there appears to be some tension or perhaps overlap between situation # 2 and # 3. Situation # 2 applies to a situation where the original bill was based upon contract carriage terms and now the carrier seeks to recover the higher tariff. Situation # 3 applies to a situation where the parties shipped at a negotiated rate and now the carrier seeks to recover the higher tariff rate. The two situations are similar because in each instance the carrier is trying recover the higher tariff rate; however, they differ in the following regard: in situation # 2 the parties contracted under the belief that they were operating pursuant to a valid contract carriage permit, while in situation # 3 the parties knowingly or negligently negotiated an illegal rate without a valid permit.[12]

In our situation, Thompson and Rock Wool are in situation # 3 because they were not engaged in contract carriage, they merely contracted at a rate below the filed tariff. The water is muddied to some extent by Rock Wool's argument before the bankruptcy court, and before this court, that it was engaged in contract carriage. However, in order to attain contract carrier status permission must be obtained at the outset and, because Thompson did not have a Section 10923 permit we are in situation # 3. As a result, the new rule MC-208 is expressly inapplicable to Rock Wool's situation.

### ii. Makita.

Makita's situation differs somewhat from Rock Wool with respect to those shipments made pursuant to the fourth tariff. Those shipments made pursuant to the first three tariffs are in situation # 3 because the parties shipped at an unfiled discount rate. The shipments made pursuant to the fourth tariff appear to have been made pursuant to a valid filed discount. Therefore, as to those shipments, situation # 1 would apply. As a result, the rule would expressly apply to those shipments made under the valid filed tariff. Under the rule, these claims should be transferred to the Commission.

We are reversing the summary judgment as to those shipments attributable to the fourth tariff. Thus, the district court must first decide, after hearing the evidence, whether in fact the fourth tariff

---

[12]In order to be exempt from the filed tariff and operate as a common contract carrier, a permit must be obtained from the ICC in advance. See 49 U.S.C. § 10923.

was a valid filed discount tariff. Assuming, that the tariff is valid,[13] as it appears to be, then the district court must still sort out which shipments are attributable to the fourth tariff. Subsequent to such an allocation, the rule, if valid,[14] would require transfer of those situation # 1 claims to the ICC.[15]

b. The Reasonableness Defense.

Rock Wool and Makita argue that the court below should have referred the case to the ICC, because their defense, that the tariffs to be applied are unreasonable, implicates the primary jurisdiction of the ICC.[16] The doctrine of primary jurisdiction "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolutions of issues [that] ... have been placed within the special competence of an administrative body...." *See, e.g., Western Pac.,* 352 U.S. at 63-64, 77 S.Ct. at 165 (tariff reasonableness within exclusive primary jurisdiction of ICC).

The issue as to rate reasonableness has had an interesting and convoluted past. Initially, the Fifth Circuit stood in the minority with its holding in *Matter of Caravan Refrigerated Cargo, Inc.,*

---

[13]If it turns out that the fourth tariff does not establish a valid filed discount, then Makita will still be able to assert the defense of reasonableness as to those claims as well. *See infra* Section b.

[14]We note that our brethren in the Third Circuit have invalidated MC-208 on the ground that its implementation exceeded the ICC's statutory authority. *See White v. United States,* No. 92-3528, --- F.2d ---- (3rd Cir. Mar. 19, 1993).

[15]Vining makes the same argument that the shipper in *White* successfully made for the rule's invalidity. Vining points to 49 U.S.C. § 11706(a), and asserts that original jurisdiction over motor carrier rates on past transportation is vested exclusively in the courts. The ICC, through MC-208, has attempted to "bud the jurisdictional line" so to speak. Therefore, the shipper reasons that the ICC has attempted to do by regulation what Congress forbade them to do statutorily.

> While we are mindful that the rule's validity is *res nova,* we will defer until after the trial court has waded through these factual questions, until we will rule as to MC-208. The rule will not apply to Rock Wool in any event. However, it would apply to Makita at least in part. Consequently, at that stage Makita may again raise this issue without prejudice.

[16]*See ICC v. Atlantic Coast Line R. Co.,* 383 U.S. 576, 579, 86 S.Ct. 1000, 1004, 16 L.Ed.2d 1009 (1966). "[T]he primary jurisdiction doctrine requires initial submission to the [ICC] of questions that raise "issues of transportation policy which ought to be considered by the Commission in the interests of a uniform an expert administration of the regulatory scheme laid down by [the] Act.' " *Id.* (*quoting United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 65, 77 S.Ct. 161, 166, 1 L.Ed.2d 126 (1956)).

864 F.2d 388 (5th Cir.1989) (the "Supreme Beef" case), *overruled by, Advance United Expressways, Inc. v. Eastman Kodak Co.,* 965 F.2d 1347, 1352 (5th Cir.1992). The Supreme Beef case determined that rate unreasonableness was not a viable defense in an undercharge action. *See Caravan,* 864 F.2d at 392. The *Caravan* holding followed a longstanding system where shippers were forced to pay the undercharges in district court, and then could pursue a reparations claim with the ICC.

Next, in the chronological progression of the viability of the Supreme Beef case came *Maislin.* The *Maislin* court struck down an ICC rule that impermissibly allowed equitable defenses to be asserted in the face of the filed tariff doctrine. *See Maislin,* 497 U.S. at 130, 110 S.Ct. at 2768. Under the rule, the ICC had attempted to allow carriers to be estopped from asserting the filed rate doctrine in undercharge claims when they knowingly negotiated below the published tariff. *See id.* The Supreme Court noted that the agency was entitled to deference; however, rejected the ICC rule because it contravened what case law had held for a century. *See id.* (*citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)).

In *Maislin,* the court remanded for a determination as to whether the tariff was reasonable. Further, Justice Brennan stated in *Maislin* that "[t]he filed rate is not enforceable if the ICC finds the rate unreasonable." *Id.* 497 U.S. at 128, 110 S.Ct. at 2767. A recent panel of our court considered Brennan's language as well as the remand, and it concluded "[t]he Supreme Court's allowance of unreasonableness as a defense against collection of undercharges trumps our holding to the contrary in *Caravan.*" *Advance United,* 965 F.2d at 1352.

Having determined that reasonableness is a valid defense to an undercharge claim, the *Advance United* panel proceeded to a primary jurisdiction analysis. Just recently, the Supreme Court in *Reiter v. Cooper,* --- U.S. ----, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993), charted a slightly different approach to undercharge collection actions than the approach outlined in *Advance United;* however, the result remains unchanged.

*Reiter* focused on the true nature of the "reasonableness defense." The court noted that the reparations action codified at Section 11705(b)(3) is a cause of action rather than a defense.

Consequently, rate unreasonableness is actually a counterclaim not a defense.[17] The court stated "[o]ne major consequence does attach to the fact that an unreasonable-rate claim is technically a counterclaim rather than a defense: A defense cannot possibly be adjudicated separately from the plaintiff's claim to which it applies; a counterclaim can be." *Reiter,* --- U.S. at ----, 113 S.Ct. at 1218.

In retrospect, the *Caravan* approach, which was the practice of entering judgment on the undercharge claims and deferring unreasonableness contentions until the reparations action before the ICC, was effectively the entry of a separate judgment. In order to enter a separate judgment on the carrier's undercharge claim without providing the shipper the opportunity to assert unreasonableness, the court must make "an express determination that there is no just reason to delay ... entry of judgment." Fed.R.Civ.P. 54(b).

Surely, in the ordinary case, where the carrier is solvent the equities would garner in favor of a separate judgment. The court in that instance could make an express determination under Rule 54(b) that judgment on the undercharge claim would not harm the shipper because the right to a reparations action before the ICC would be left unimpaired. However, where as here, when the carrier is insolvent the equities normally mandate a different result.

The Caravan approach worked fine outside of bankruptcy where all of the shipper's rights were preserved by the reparations action. However, as Rock Wool argues, and as the ICC recognizes in Ex Parte No. MC-208, this right to a reparations action is largely useless in the bankruptcy context.[18] The uselessness emanates from the reality that money paid to a bankrupt entity will not be returned—once paid it is irretrievably lost. Therefore, the entitlement to a reparations claim is at best illusory. In order to preserve the shipper's right to assert reasonableness as a partial or total bar

---

[17]The Court found that although the shipper had mistakenly pleaded unreasonableness as a defense, under Fed.R.Civ.P. 8(c) a court may treat the pleading as if there had been a proper designation. *Reiter,* --- U.S. at ----, 113 S.Ct. at 1217.

[18]The *Advance United* court noted:

> Because the carrier's assets, along with the judgment collected in this case, will have been distributed to the creditors before a subsequent action can be filed, [the shipper] is unlikely ever to recover wrongfully paid monies.

*Advance United,* 965 F.2d at 1352.

to recovery, in bankruptcy the shipper must be able to assert its counterclaim before it is required to pay.[19]

The *Advance United* court concluded that on remand the issue of reasonableness was certainly within the ken of the ICC and, thus, the Commission possessed primary jurisdiction. *See id.* at 1353. However, the *Advance United* panel also seemed to note that if the district court determines that it can resolve the issues of reasonableness without the need for ICC expertise, then it is permitted to decide the issue. *See id.*

Therefore, when analyzing the bankruptcy court's order, the court incorrectly stated that "The issue of rate reasonableness does not constitute a defense to an action to collect freight charges. The reparations remedy set by statute pro vides the sole and exclusive remedy for claimed excessive charges." This statement is incorrect in light of *Reiter.*

However, the bankruptcy court buttressed its rejection of the reasonableness defense by noting: "Even if the unreasonableness of the debtor's rates would have been a defense in this action, defendant completely failed to show that there existed any issue of material fact concerning the reasonableness or the applicability of the rates in the tariffs utilized in reaching the amount of the undercharges." The court reasoned that litigants need to provide more than a mere pleading of unreasonableness in order to invoke the primary jurisdiction of the ICC.[20] The litigants do argue in their brief that the tariff that was applied was beyond the expectation of both parties. It is difficult to imagine what factual issues one could raise by alleging unreasonableness, without having some familiarity with the tariff structure.

In *Great N. Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943

---

[19]The Supreme Court in Reiter alluded to two possible remedies to the shipper's problem in this regard: (i) the district court may refer the issue of reasonableness to the ICC and stay its proceedings in the interim; or (ii) it could enter a separate judgment and require the shipper to deposit the amount of the judgment with the court pending the outcome of the reparations action before the ICC. *See Reiter,* --- U.S. at ----, 113 S.Ct. at 1221.

[20]*See Western Pacific,* 352 U.S. at 68-69, 77 S.Ct. at 167. "[T]he mere fact that the issue is phrased ... as a matter of reasonableness should not be determinative on the jurisdictional issue. To hold otherwise would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader." *Id.*

(1922), Justice Brandeis stated:

> Whenever a rate ... is attacked as unreasonable ... there must be preliminary resort to the [Interstate Commerce] Commission.... [O]rdinarily the determining factor [in deciding the application of primary jurisdiction] is ... the character of the controverted question and the nature of the enquiry necessary for its resolution.... Preliminary resort to the Commission ... is required because the enquiry is one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable; and such acquaintance is commonly to be found only in a body of experts.

*Id.* at 291, 42 S.Ct. at 479.

While we are mindful, that there may be instances where the ICC's expertise may not be needed, it appears that rate reasonableness is one area where uniformity and agency knowledge are essential to a proper result. Therefore, if the court determines that the equities do not favor entering a separate judgment, then the court should refer[21] the issue of rate reasonableness to the ICC. *See, e.g., Maislin,* 497 U.S. at 119, 110 S.Ct. at 2762 ("ICC has primary responsibility for determining whether a rate or practice is reasonable") (*citing Texas & Pac. R.R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 440-42, 27 S.Ct. 350, 355-56, 51 L.Ed. 553 (1907)).

*c. Motor Contract Carriage.*

Rock Wool contended before the courts below that Thompson was a motor *contract* carrier rather than a motor *common* carrier.[22] The bankruptcy court performed a forceful analysis of the then applicable statutory guidelines for contract carrier status, and concluded that Thompson and Rock Wool were not engaged in contract carriage. We agree that under 49 C.F.R. § 1053.1, there was no contract carriage. Further, we buttress our position by noting that a permit for contract carriage should have been obtained prior to any purported contract carriage shipments. *See* 49 U.S.C. § 10923.

Without a valid permit at the outset, the shipper cannot argue that it had shipped its goods

---

[21]There is no statutory procedure by which a court can require a determination from the ICC. The term "referral" has been used to label the process that has developed, where the court stays its proceedings in order to provide the shipper with a reasonable opportunity to file an administrative complaint before the ICC. *See Reiter,* --- U.S. at ---- n. 3, 113 S.Ct. at 1220 n. 3.

[22]The ICC has set the system up in such a way that motor *contract* carriers are not subject to the filed tariff structure while motor *common* carriers must comply with the filed tariff.

free of the published tariff because it had met all of the qualifications needed for contract carriage status. Simply, the shipper cannot argue after the fact that it was engaged in contract carriage. Therefore, because Rock Wool did not ship its goods pursuant to a valid contract carriage permit, it was subject to the applicable filed tariff.

*d. The Applicable Tariffs.*

Makita argues that it and Thompson contracted at discount rates that were on file with the ICC. In support of its position, Makita presented four filed tariff sheets. Three of the four tariffs provide:

> The discount named in this Item is applicable only on shipments from shippers which are participants in the provisions of the Item. Each shipper desiring to participate in the provisions of the Item must notify in writing by certified mail, the Traffic Manager of Steve D. Thompson Trucking, Inc., ... of its desire to participate and must specify this item by number. The shipper will receive an acknowledgment in writing from the Traffic Manager of Steve D. Thompson Trucking, Inc. advising it of the date on which its participation is to be effective.[23]

The district court found, and we agree, that Makita failed to produce the proper notification required under these three tariffs. The fourth tariff sheet, ICC THST 100, Item 7510 New (R), effective May 23, 1987, contains no such participation requirement, but rather indicates on its face that it applies to Makita shipments. At least as to those shipments attributable to the fourth tariff, Thompson has raised a genuine factual dispute. Facially, it appears that those shipments made pursuant to the fourth tariff were properly billed at a discount rate.

Therefore, the filed rate doctrine applies to all shipments attributable to the first three tariffs; however, the fourth tariff appears to exempt Makita from the filed tariff. Consequently, the summary judgment was improper as to any shipments made pursuant to the fourth tariff.

## CONCLUSION

The new ICC rule MC-208 does not apply to Rock Wool's situation. In Makita's case, the rule will apply to those shipments attributable to the fourth tariff provided that it was an effective discount tariff; however, we need not decide whether the rule is valid at this stage until after the district court makes this factual determination.

---

[23]ICC THST 102, Items 4530, 4545, 5050 New (R).

Based on the law as it stands after *Reiter,* Rock Wool and Makita may assert rate unreasonableness as a total or partial bar to an undercharge action unless the district court makes a Rule 54(b) express determination. Therefore, on remand the court must either make an express determination or refer rate unreasonableness to the ICC under the primary jurisdiction doctrine.

Thompson and Rock Wool were not engaged in contract carriage and, thus, they were required to comply with the applicable published tariff. As to Makita, the summary judgment is reversed as to those shipments attributable to the fourth tariff because on its face it appears to establish a valid filed discount. We need not reach the sufficiency of the evidence and interest issues because we find that summary judgment was improper as to both Rock Wool and Makita. Therefore, the judgment of the district court is REVERSED and REMANDED.